# 24-2594

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

MICHELLE PHIPPEN, INDIVIDUALLY AND AS GENERAL GUARDIAN OF P.P. AND L.A., MINORS, ALISHA DAY, INDIVIDUALLY AND AS MOTHER, GENERAL GUARDIAN OF A.D., A MINOR, SARAH STOKES, INDIVIDUALLY AND AS GENERAL GUARDIAN OF K.G., A MINOR, JUAN EMANUEL BORDOY, INDIVIDUALLY, MARY ELIN ARCE, INDIVIDUALLY AND AS MOTHER OF JUAN EMANUEL BORDOY, AMANDA TRIGLOFF, INDIVIDUALLY AND AS GENERAL GUARDIAN OF R.S., A MINOR, DEANDRE BARBEE, INDIVIDUALLY, JANTAIL BARBEE, INDIVIDUALLY AND AS MOTHER OF DEANDRE BARBEE, LAURIE COURINGTON, HUNTER COURINGTON, JENNIFER MORROW, ALENA MORROW, CALLISTA BASSETT,

(*Caption continued on inside cover*)

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS [REDACTED]

---

ASHLEY C. KELLER
ASHLEY L.F. BARRIERE
KELLER POSTMAN LLC
150 North Riverside Plaza,
    Suite 4100
Chicago, Illinois 60606
(312) 741-5220

JOHN J. SNIDOW
ROSEANN R. ROMANO
KELLER POSTMAN LLC
1101 Connecticut Avenue NW,
    Suite 1100
Washington, DC 20036
(202) 378-0649

*Attorneys for Plaintiffs-Appellants Sonnita Roby, Taylor Brown, Michelle Phippen, Amanda Trigloff, Laurie Courington, Hunter Courington, Jennifer Morrow, Alena Morrow, Callista Bassett, Andrew Bassett, Shannon Mikuski, Braydon McKenzie, Heather Gilliam, Colby Gilliam, and Michelle Brown*

(*Counsel continued on inside cover*)

ANDREW BASSETT, SONNITA ROBY, INDIVIDUALLY AND AS GENERAL GUARDIAN OF D.P., A MINOR, SHANNON MIKUSKI, BRAYDON MCKENZIE, HEATHER GILLIAM, COLBY GILLIAM, TAYLOR BROWN, TARYNE BURKE, INDIVIDUALLY AND AS MOTHER WITH COURT APPOINTED GUARDIAN OF ASHTON BURKE, SAMARI SIMS, INDIVIDUALLY, DENISA CULLOM, INDIVIDUALLY AND AS MOTHER OF SAMARI SIMS, COLLIN STOVER, INDIVIDUALLY, DANA STEWART, INDIVIDUALLY AND AS MOTHER OF COLLING STOVER, RIAN CZAR JOHNSON, INDIVIDUALLY, SHILO RICH, INDIVIDUALLY AND AS MOTHER OF RIAN CZAR JOHNSON, SHEENA SCHNEPP, INDIVIDUALLY AND AS MOTHER AND NATURAL GUARDIAN OF H.S., A MINOR, ZAYNE COSTELLO, INDIVIDUALLY, CRYSTAL ALEXANDER, COURTNEY TILLOTSON, MICHELLE BROWN,

*Plaintiffs-Appellants,*

—against—

WALGREENS CO., JOHNSON & JOHNSON CONSUMER INC., WALMART INC.,

*Defendants-Appellees.*

———————————

DANIEL C. BURKE
BERNSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
(212) 779-1414

*Attorneys for Plaintiffs-Appellants
Juan Emanuel Bordoy, Mary Elin
Arce, Deandre Barbee, Jantail
Barbee, Taryne Burke, Samari Sims,
Denisa Cullom, Collin Stover,
Dana Stewart, Rian Czar Johnson,
Shilo Rich, Sheena Schnepp, Zayne
Costello, Crystal Alexander, and
Courtney Tillotson*

LINDSEY SCARCELLO
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 701-1100
lscarcello@wcllp.com

*Attorneys for Plaintiff-Appellant
Alisha Day*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT ................................................................1

JURISDICTIONAL STATEMENT ..........................................................8

STATEMENT OF THE ISSUES ..............................................................9

STATEMENT OF THE CASE...................................................................9

    I.    Scientific Background ................................................................9

    II.   Procedural History ..................................................................12

           A.   Dr. Ness's Qualifications...................................................13

           B.   Dr. Ness Faithfully Applied the District Court's Announced Scientific Rules.................................................................14

           C.   The District Court Excluded Dr. Ness Based on Its Own View of the Science....................................................................19

           D.   The District Court Weighed the Evidence and Granted Summary Judgment. ........................................................................23

SUMMARY OF THE ARGUMENT .......................................................25

STANDARD OF REVIEW .....................................................................27

ARGUMENT ..........................................................................................28

    I.    The District Court Erroneously Excluded Dr. Ness's Expert Opinions. ................................................................................28

           A.   Dr. Ness Addressed the Methodological "Flaws" That the District Court Identified. .................................................29

           B.   The District Court Excluded Dr. Ness Because It Disagreed With Her Conclusions. ...................................................31

           C.   The District Court's Remaining Methodological Criticisms Were Based on Scientific Rules of Its Own Making. ...................................36

    II.   The District Court Erred By Granting Defendants Summary Judgment Because Plaintiffs Could Prove Causation Through Defendants' Experts. ...............................................................40

CONCLUSION .......................................................................................47

CERTIFICATE OF COMPLIANCE .......................................................48

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ambrosini v. Labarraque*,
   101 F.3d 129 (D.C. Cir. 1996) ...........................................................32

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...............................................29, 32, 35

*Anderson v. Metro-N. Commuter R.R. Co.*,
   No. 3:14-cv-452 (JBA), 2016 WL 2755910
   (D. Conn. May 11, 2016) ...................................................................43

*Baltas v. Maiga*,
   119 F.4th 255 (2d Cir. 2024) .............................................................27

*Barnes v. Anderson*,
   202 F.3d 150 (2d Cir. 1999) ..............................................................42

*Carroll v. Trump*,
   124 F.4th 140 (2d Cir. 2024) (per curiam) ........................................27

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ...........................................................40

*Elosu v. Middlefork Ranch Inc.*,
   26 F.4th 1017 (9th Cir. 2022) .................................................28, 32, 33

*Ezrasons, Inc. v. Travelers Indem. Co.*,
   89 F.4th 388 (2d Cir. 2023) .........................................................28, 41

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...........................................................................36

*Glendale Fed. Bank, FSB v. United States*,
   39 Fed. Cl. 422 (1997) .......................................................................41

*Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*,
   No. 17-1136(RAM), 2021 WL 3134482 (D.P.R. July 23, 2021) .................42

*In re Hanford Nuclear Rsrv. Litig.*,
534 F.3d 986 (9th Cir. 2008) ...................................................41

*In re Joint E. & S. Dist. Asbestos Litig.*,
52 F.3d 1124 (2d Cir. 1995) ...................................................32

*Kee v. City of New York*,
12 F.4th 150 (2d Cir. 2021) ...................................................28

*Kilpatrick v. Breg, Inc.*,
613 F.3d 1329 (11th Cir. 2010) ...........................................39

*Lucente v. County of Suffolk*,
980 F.3d 284 (2d Cir. 2020) ...................................................41

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) ...........................................39

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011) ...............................32, 33, 37, 39

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
387 F. Supp. 3d 323 (S.D.N.Y. 2019) .................................43

*Palin v. N.Y. Times Co.*,
113 F.4th 245 (2d Cir. 2024) .............................................7, 45, 47

*Peterson v. Bank Markazi*,
121 F.4th 983 (2d Cir. 2024) ...................................................27

*Realtime Data, LLC v. Morgan Stanley*,
897 F. Supp. 2d 146 (S.D.N.Y. 2012) .................................33

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)...................................................................44

*SEC v. Koenig*,
557 F.3d 736 (7th Cir. 2009) ...................................................42

*United States v. Bohle*,
475 F.2d 872 (2d Cir. 1973) ...................................................33

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) ...............................................................27

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ...........................................................................41

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) ...............................................................27

*Zervos v. Verizon N.Y., Inc.*,
  252 F.3d 163 (2d Cir. 2001) ...............................................................27

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
  858 F.3d 787 (3d Cir. 2017) ...............................................................43

**Statutes**

28 U.S.C.
  § 1291 .....................................................................................................8
  § 1332(a) .................................................................................................8
  § 1407 .....................................................................................................8

**Rules**

Fed. R. Civ. P. 56 ...............................................................................7, 27, 46

Fed. R. Evid. 702 ............................................. 2, 3, 5, 22, 23, 26, 32, 36, 37, 40, 41

**Other Authorities**

Daniel W. Cramer, *Acetaminophen Use During Pregnancy*, 332
  JAMA 338(2024) ..................................................................................35

David L. Eaton, *Scientific Judgment and Toxic Torts-A Primer in
  Toxicology for Judges and Lawyers*, 12 J.L. & Pol'y 5 (2003).........................39

Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 619 (3d ed.
  2011) .....................................................................................................46

The Federalist No. 78 (Alexander Hamilton) (Clinton Rossiter ed.
  1961) ......................................................................................................8

iv

John P. Jones III et al., *Evaluating the Role of Susceptibility Inducing Cofactors and of Acetaminophen in the Etiology of Autism Spectrum Disorder*, 14 Life 918 (2024) ....................................................33, 35

Joseph Sanders et al., *Differential Etiology: Inferring Specific Causation in the Law from Group Data in Science*, 63 Ariz. L. Rev. 851 (2021) ................................................................................43

*Past Lilienfeld Awards*, Am. Coll. of Epidemiology................................................14

Timothy Lash et al., *Modern Epidemiology* 919 (4th ed. 2021) ...........................37

## PRELIMINARY STATEMENT

When a district court is intent on taking a question of fact from a jury, it often follows a familiar path: recite the relevant legal standard, then apply it to reach a predetermined outcome. Such judicial factfinding, in other words, is typically couched as a mere "application" of the accurately recited evidentiary or summary-judgment standard. In edge cases, it can be difficult to discern whether a district court has engaged in this forbidden practice. But here, the underlying facts, litigation history, and final orders leave no doubt about what really occurred.

Plaintiffs rely on a large and compelling body of scientific evidence to show that prenatal exposure to acetaminophen (APAP) causes neurodevelopmental disorders in children, including autism spectrum disorder (ASD) and attention-deficit/hyperactivity disorder (ADHD). *See* 916.Plaintiffs' Br 9–12.[1] The policy implications of this contention are profound. Over half of pregnant women—millions of Americans—use APAP each year to treat fever and pain. *See* 916.A-4857 (Baker (2022)). They do so because Johnson & Johnson Consumer, Inc. (n/k/a Kenvue Brands LLC) and other Defendants have convinced them that it is the only

---

[1] Citations with a 916 prefix refer to documents filed in Appeal No. 24-916, one of the appeals being heard in tandem with this appeal. Pursuant to the Court's January 10 Order, the pagination for the Special Appendix and Joint Appendix in this appeal continue from the No. 24-916 Special Appendix and Joint Appendix pagination. Pages starting at SPA-175 and A-6721 are in this appeal's Special Appendix and Joint Appendix, respectively.

1

safe over-the-counter drug for pregnant women to take for these symptoms. *See* 916.A-5570–71. If Plaintiffs and their world-renowned experts are correct that APAP causes ADHD and ASD, the drug is contributing to a public health crisis.

That resolving a disputed factual question would have such significant ramifications, however, says nothing about the division of labor between judges and juries. Yet throughout the proceedings below, the District Court was laser-focused on the policy implications associated with the factual question of general causation. From the very start, it sought *sua sponte* the Food and Drug Administration's input on whether a warning was warranted and asked Plaintiffs to produce a draft warning label. 916.A-562 (Tr. 74:14–22); 916.A-574 (Tr. 86:15–19). To Plaintiffs' knowledge, no other district court in a drug or device MDL has ever solicited (legally irrelevant) input from the FDA or required plaintiffs to supply proposed warning language when state law makes crystal clear that this is not their burden. But the District Court was motivated by its "broader purpose, a purpose we all share of promoting health among our population here, tak[ing] care of pregnant women and their children." 916.A-574 (Tr. 86:15–19). The Rule 702 hearing similarly began with multiple statements from the bench on how important this case's outcome was to pregnant women, and those statements were repeated in the District Court's opinions. 916.A-5369–71 (Tr. 4:21–6:5) ("resolution of this MDL[,] one way or the other, has profound consequences for the health and safety of pregnant women"

2

because "[f]evers and pain during pregnancy have identified negative impacts on mothers" and medications other than APAP "cannot be used to treat these conditions"); 916.A-5537; SPA-179.

While the District Court was focused on reaching what it viewed as a good policy outcome, Plaintiffs provided a wealth of admissible evidence that would easily permit a reasonable jury to find causation. They offered scientific opinions from five of the most qualified experts in the world, including their epidemiologist, Dr. Andrea Baccarelli, the Dean of Harvard's T.H. Chan School of Public Health. These experts painstakingly evaluated scores of peer-reviewed studies by applying the standard methodologies of their scientific disciplines. Each concluded that causation was the most likely explanation for the repeatedly observed association between prenatal APAP exposure and ASD/ADHD.

The District Court excluded all five experts. Reiterating its focus on public policy, the District Court asserted that it "matters to get this [factual question] right." 916.A-5537. To "get it right," the District Court followed the outcome-oriented playbook. It correctly cited Rule 702's requirement that experts reliably apply the methods and principles of their scientific disciplines to the facts of a case. Under the guise of applying that standard, the District Court proceeded to contort it by declaring—without citation to *any* scientific authority—that the experts' methods

3

were unreliable because they failed to adhere to multiple scientific "rules" that were cut from whole cloth. *See* 916.Plaintiffs' Br. 4–6.

Given the importance of these claims to the individual mothers and children, however, Plaintiffs tried to play by the District Court's invented rules in hopes of presenting expert testimony that the District Court would permit. They offered yet another highly qualified expert, Dr. Roberta Ness, a recipient of the most prestigious award in epidemiology and a member of the National Academy of Medicine. Dr. Ness addressed the putative methodological flaws the District Court previously concocted, limiting her opinion to the link between prenatal APAP exposure and ADHD alone, relying only on studies that used confirmed diagnoses of ADHD, and extensively evaluating the possibility of genetic confounding. None of that mattered to the District Court. "[G]iven the state of the science Dr. Ness confronted long odds in offering her opinion on causation." SPA-256. In other words, any expert reaching the *conclusion* of causation would be, *ipso facto*, unreliably applying his or her methods and principles. The District Court said this explicitly to warn off future Plaintiffs from even attempting to designate another expert: "[T]he state of scientific evidence . . . presents a challenge for *any expert witness* offering the opinion that [APAP] use causes ADHD." SPA-214 (emphasis added).

The District Court's treatment of Ahlqvist (2024), a study published *after* Dr. Ness submitted her report, vividly illustrates the District Court's determination

4

to rule based on its own assessment of the science. In the District Court's view, that study (which has been roundly criticized on methodological grounds) showed that the association between prenatal APAP exposure and ADHD was not a causal one. Thus, even though Dr. Ness *could not have* analyzed that study in her report, the District Court nevertheless *criticized* her analysis for failing to address it. Yet if Rule 702 is about reliability, it must be true as a matter of law that an expert has not unreliably applied her scientific methods for failing to analyze evidence that did not exist. It is difficult to imagine a starker illustration of a district court invoking the applicable standard in service of reaching a preordained outcome.

Even without their own retained experts' testimony, Plaintiffs *still* had sufficient evidence to reach a jury. That is because the scientific evidence so strongly supports causation that *Defendants*' own expert, Dr. Stephen Faraone, has repeatedly offered admissible opinions that a jury could credit. Among other things, Dr. Faraone has stated:

- Among all "environmental risk factors" for ADHD, "[t]he strongest evidence is for . . . [e]xposure during the fetal period to . . . [APAP]." 916.A-4325 (Tr. 401:16–18, 403:13–21).

- "[M]aternal use of [APAP] during pregnancy was associated with a 33% greater likelihood of ADHD in their children," and there was "a dose-response

5

relationship between maternal prenatal use of [APAP] and ADHD." 916.A-4772 (Faraone (2021)) (spacing altered).

- "There does seem to be a weak, yet real, association between maternal use of [APAP] while pregnant and subsequent ADHD . . . in the exposed child." A-8645 (emphasis removed).

- It makes "biological sense[] that [APAP] exposure during pregnancy could cause ADHD[.]" 916.A-4307 (Tr. 331:19–332:4).

He also posted a slide deck on his website, The ADHD Evidence Project, with the following slides, in order:



6

Modifiable Environmental Risk Factors for ADHD

**EXPOSURES TO CHILDREN**
- Lead exposure
- Artificial food colorants
- Poverty
- Organophosphate pesticide exposure
- Family adversity – Low cohesion
- Extreme deprivation

**NUTRIENT DEFICIENCIES**
- Iron deficiency
- Omega-3 polyunsaturated Fatty Acid Deficiency
- Vitamin D deficiency

**EXPOSURES TO THE FETUS**
- acetaminophen
- Valproate
- Phthalate
- Maternal pre-eclampsia & hypertension
- Maternal stress
- Preterm birth

Slide courtesy of www.ADHDevidence.org

916.A-5347–48.

Dr. Faraone was not the only defense expert who made statements supporting Plaintiffs' general causation theory. A textbook chapter that Dr. Alex Kolevzon co-authored states that "several prenatal exposures . . . emerge as potential risk factors for" neurodevelopmental disorders, including "[m]ost notably . . . prenatal use of [APAP]." 916.A-4843.

Construing this admissible evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that prenatal APAP exposure causes ADHD. The District Court nonetheless entered summary judgment for Defendants. Although the District Court recited the familiar Rule 56 standard, it then proceeded to make credibility determinations and adopt Dr. Faraone's litigation-driven clarifications of his own previous statements. That approach is error, as this Court reiterated just last year. *See Palin v. N.Y. Times Co.*, 113 F.4th 245, 264 (2d Cir. 2024).

7

There is no question that the District Court sincerely believes that prenatal APAP exposure does not cause ADHD. And there is no question that the District Court sincerely believes that entrusting a jury to reach a contrary factual conclusion would have adverse policy consequences. But the law does not permit the District Court to act on those convictions. To reach its preferred outcome, the District Court was forced to label six of our Nation's preeminent scientists unreliable guns for hire, declare the winner of an ongoing scientific debate, and walk back the causation-supporting opinions of Defendants' own expert. If allowed to stand, that exercise of "WILL instead of JUDGMENT," The Federalist No. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed. 1961), will deter qualified scientists in future cases from putting their reputations on the line in courts of law and permit judges to cut off litigation based on their own policy views. And, here, the decision below will rob millions of American women of their right to receive truthful warnings about the serious risk APAP poses to the health of their children. This Court should reverse.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1332(a) and 1407. It entered final judgment on August 21, 2024. A-8810. Plaintiffs filed a timely notice of appeal on September 20, 2024. A-8811. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

8

## STATEMENT OF THE ISSUES

1.  Whether the District Court erred by excluding the testimony of one of the world's leading epidemiologists and women's health experts, Dr. Ness.

2.  Whether the District Court erred by granting summary judgment when there was a genuine dispute about whether prenatal exposure to APAP increases the risk of ADHD.

## STATEMENT OF THE CASE

### I.    Scientific Background

Plaintiffs' opening brief in Appeal No. 24-916 details the scientific background as well as the evidence supporting the causal link between prenatal APAP exposure and ADHD. 916.Plaintiffs' Br. 9–12. One additional feature of the scientific evidence is particularly relevant to this appeal.

Over the last decade, Defendants' own expert, Dr. Faraone, has repeatedly published research and opinions that support the factual inference that prenatal APAP exposure causes ADHD. As the senior author of a peer-reviewed paper, he concluded there was "preliminary, suggestive evidence that oxidative stress plays a role in the pathophysiology of ADHD." 916.A-4822 (Joseph (2015)). A year later, he posted on LinkedIn saying that "[t]here does seem to be a weak, yet real, association between maternal use of [APAP] while pregnant and subsequent ADHD . . . in the exposed child." A-8645 (emphasis removed). In 2017, Dr. Faraone wrote

9

on LinkedIn that prenatal APAP exposure "changes the fetal genome via a process called methylation. Such genomic changes could increase risk for ADHD." A-8647.

In 2019, Dr. Faraone recognized that "environmental risk factor[s] must contribute to the etiology of ADHD," including "how genes and [the] environment work together." A-8666, A-8668. Showing that his views had not changed since 2016, in 2020 he copied his 2016 LinkedIn post on the American Professional Society of ADHD and Related Disorders's website. A-8784. The following year he put the 2016 LinkedIn post on his website—The ADHD Evidence Project. A-8786–88. He also put the 2017 LinkedIn post on his website. A-8790–91.

In 2021, the same year 91 scientists published a consensus statement urging "a call for precautionary action" regarding prenatal use of APAP, 916.A-4689 (Bauer (2021)), Dr. Faraone penned a consensus statement about ADHD more broadly. In it, he and his colleagues said that "maternal use of [APAP] during pregnancy was associated with a 33% greater likelihood of ADHD in their children," and there is "a dose-response relationship between maternal prenatal use of [APAP] and ADHD." 916.A-4772 (Faraone (2021)) (spacing altered).

Dr. Faraone did not change his mind after parents and children sued over Defendants' failure to warn of the dangers of prenatal APAP exposure. In 2022, he posted the slides, *supra* pp. 6–7, on his website, prominently listing prenatal APAP exposure as a cause of ADHD. 916.A-5347–48. Later in 2022, a paper he co-

10

authored said that the "strongest evidence" for environmental factors that "increase the risk for ADHD" was for prenatal APAP exposure. 916.A-4799 (Khoury (2022)).

True, when he drafted his report for Defendants, Dr. Faraone of course disclaimed causation. But even after he became a defense expert, Dr. Faraone continued to offer opinions in support of interpreting the association between prenatal APAP exposure and ADHD to be a causal one. For example, when questioned at his deposition, he admitted that "evidence-based findings that are unlikely to be overturned in the near future" include the fact that prenatal APAP exposure "is associated with a 33 percent greater likelihood of ADHD in children." 916.A-4315 (Tr. 363:10–12, 363:19–364:2). He added that "there's a dose-response relationship between maternal prenatal use of [APAP] and ADHD." 916.A-4316 (Tr. 367:21–368:9). Dr. Faraone also agreed that there is "a weak, yet real association, between" prenatal APAP exposure "and subsequent ADHD . . . in the exposed child." 916.A-4305 (Tr. 324:11–25). He reaffirmed the statements he had previously made that, among all "environmental risk factors" for ADHD, "[t]he strongest evidence is for . . . [e]xposure during the fetal period to . . . [APAP]." 916.A-4325 (Tr. 401:16–18, 403:13–21).

According to Dr. Faraone, studies with statistically significant results "all show a positive risk ratio," 916.A-4342 (Tr. 470:21–471:4), suggesting a causal association between prenatal APAP exposure and ADHD. 916.A-4343 (Tr. 473:17–

474:8).  This is unsurprising because, according to him, it makes "biological sense[]" that [APAP] exposure during pregnancy could cause ADHD[.]"  916.A-4307 (Tr. 331:19–332:4).

## II.  Procedural History

The procedural history of this case up until the designation of Dr. Ness is outlined in the tandem cases' briefing.  *See* 916.Plaintiffs' Br. 13–23.  To summarize, the District Court faulted Plaintiffs' first five experts' analyses in the following ways:

- They analyzed together that APAP causes ADHD and ASD rather than evaluating each condition individually.

- They considered studies that evaluated symptoms of ADHD and ASD, rather than limiting their review to confirmed diagnoses, in their Bradford Hill analyses.

- They did not "adequately" grapple with the possibility of genetic confounding.

- They found that there was a dose response even though there was not milligram-level data available about dose.

- They found that the biological plausibility criterion was satisfied based on plausible mechanisms of action that were not *certain* mechanisms of action.

- They did not explain how much weight they gave to each Bradford Hill criterion.

12

As explained in the tandem cases' briefing, these purported failures were invented by the District Court and do not reflect the actual standards of practicing scientists. *See* 916.Plaintiffs' Br. 29–48. Even so, Plaintiffs believed that the scientific evidence was strong enough for an expert to reach a reliable causation opinion while fully complying with the District Court's purported scientific "rules." Plaintiffs thus offered one of the most qualified epidemiologists in the women's health space, Dr. Ness, to testify regarding the causal relationship between prenatal APAP exposure and ADHD.

### A. Dr. Ness's Qualifications.

Dr. Ness received her medical degree from Cornell and a master's degree in public health in epidemiology from Columbia. A-7463. From 2008 to 2014, she was Dean of the University of Texas School of Public Health. A-7464. After that, she was the James W. Rockwell Professor in Public Health (Preventive Medicine and Epidemiology) at the University of Texas at Houston until her retirement. A-7465.

Dr. Ness has over three decades of experience conducting epidemiological research. Her research has included reviewing epidemiological data on "in utero exposures to toxicants." A-7617 (Tr. 162:18–20); A-7473–77. The Nation's leading epidemiological organizations and others have recognized Dr. Ness for her outstanding work. In 2017, the American College of Epidemiology gave her the

Lilienfeld Award—the group's "most prestigious award"—for her "outstanding" contributions to the field of epidemiology. *Past Lilienfeld Awards*, Am. Coll. of Epidemiology, https://perma.cc/3XX9-UW78. This was after she served as president of both the American College of Epidemiology and American Epidemiological Society. A-7467. She was also elected to the prestigious National Academy of Medicine based on her distinguished and continuing achievements in epidemiology and women's health. A-7233.

## B. Dr. Ness Faithfully Applied the District Court's Announced Scientific Rules.

Dr. Ness carefully read the District Court's opinion excluding the first five experts' opinions. Though she disagreed with the District Court's scientific "rules," at Plaintiffs' counsels' instruction, she conducted her analysis to comply with the District Court's standards.

*First*, Dr. Ness's Bradford Hill analysis focused only on whether prenatal APAP exposure causes ADHD. *See* A-7280. This addressed the "problem" that the Plaintiffs' prior experts conducted a "'transdiagnostic' analysis." 916.A-5536.

*Second*, Dr. Ness considered only diagnostic endpoint studies—that is, studies that use as endpoints only diagnosed cases of ADHD—in her Bradford Hill analysis. As she explained, she discussed "studies employing non-diagnostic endpoints [(*e.g.*, symptoms of ADHD)] for context only." A-7426.

14

*Third*, Dr. Ness painstakingly considered whether genetic confounding explains the association between prenatal APAP exposure and ADHD. She noted when studies failed to control for "genetic confounding." *E.g.*, A-7286 (discussing Liew (2014)); A-7297 (discussing Ji (2018)); A-7302 (discussing Chen (2019)); A-7311 (discussing Baker (2020)). She explained how some studies controlled for possible genetic confounding. *E.g.*, A-7292–94 (discussing the treatment of genetic confounding in Ystrom (2017)); A-7302–03, 7305–06 (same for Liew (2019)); A-7321–23 (same for Gustavson (2021)); A-7344 (same for Brandlistuen (2013)). She carefully evaluated the Gustavson (2021) study, which the District Court had emphasized in its first opinion. A-7318–23, A-7424–25. Dr. Ness explained that because the study was "powered primarily by only 34 informative sibling pairs, th[e] result had limited precision." A-7424. Indeed, as Dr. Ness emphasized, the study's authors agreed with this concern: "the finding of similar risk for ADHD in siblings discordant for long-term maternal [APAP] use must be interpreted with caution and needs to be replicated in other studies." A-7424 (quoting 916.A-4544 (Gustavson (2021))).

Besides the literature review, Dr. Ness's report also had an entire section on genetic confounding. *See* A-7422–27. There, she candidly explained that there was some evidence of genetics at work but, on balance, she believed that the results of the control studies showed that there likely remains a real, causal association

15

between prenatal APAP exposure and ADHD. As she noted, "genetics contributes to ADHD risk" but there was "no compelling data in the literature to date to support the idea that genetics could *eliminate* the association." A-7422, A-7425.

*Fourth*, Dr. Ness explained why the dose-response criterion was met despite the lack of milligram-level dose information. Dr. Ness "agree[d with the District Court] that actual quantitative doses (in terms of milligrams) were not recorded." A-7406. But as she explained, dose quantity "is not required for scientists to reach a conclusion on dose response." A-7406. The studies' "findings that higher concentration (representing amount), longer duration, and more frequent use all consistently increased risk, in aggregate argue strongly for a dose-response relationship." A-7406.

Her opinion mirrored how real epidemiologists operate. "In the field of epidemiology, it is common for scientists to evaluate dose response based on days of exposure, weeks of exposure, or other proxies for quantitative dose in milligrams." A-7406. For example, the Centers for Disease Control and Prevention used that method when evaluating water contamination at Camp Lejeune. *See* A-7406–07 (citing A-7951 (ATSDR (2017))). It is not only independent scientists who deploy Dr. Ness's approach. █████████████████████████████ ████████████████████████████████████████████████ APAP-JJCI-0001712819.

*Fifth*, Dr. Ness explained how the biological plausibility criterion was satisfied despite the precise process for prenatal APAP exposure causing ADHD being unknown. As she stated, biological plausibility "is not about the identification of a definitive biologic pathway but instead a plausible explanation for the biology underlying a cause-effect relationship." A-7385. This is why "there are [in]numerable examples of exposures we currently consider causal, yet we do not fully understand and for which we can only posit the underlying biologic mechanism." A-7386. For example, we don't know why hormone therapy for post-menopausal women leads to breast cancer. *See* A-7238. But it is generally accepted that it does. As for prenatal APAP exposure causing ADHD, "the mechanisms proposed . . . include the stimulation of the endocannabinoid system, changes in brain-derived neurotrophic factor (BDNF) levels, oxidative stress due to inflammation-induced immune activation, changes in neurotransmission and endocrine-disruptive properties of [APAP]." A-7389 (quoting 916.A-4467 (Alemany (2021))). Several studies have found these explanations plausible; not a single study has said that they are implausible. *See* A-7389.

*Sixth*, Dr. Ness explained the weights that she assigned to each Bradford Hill criterion and why she assigned those weights. A-7381; A-7385; A-7399; A-7402; A-7403; A-7408; A-7412; A-7413; A-7415.

17

Dr. Ness also addressed statements by medical organizations and governmental bodies that the District Court cited in its first *Daubert* opinion. *See* A-7428–30. She explained the limitations of these organizations' reviews, pointing out that most simply said they could not support a warning without "their own complete review of the data," A-7428, and that none of them (including the FDA) conducted a systematic review of the literature. *See* A-7429–30. And nothing in the three organizations' reviews changed Dr. Ness's opinion. A-7432–34.

In short, Dr. Ness explicitly addressed the methodological shortcomings that the District Court identified and described the flaws in the District Court's reading of the scientific literature. She then explained why she nonetheless concluded that prenatal APAP exposure can cause ADHD.

Of course, these responses to the District Court's opinion excluding the first five experts were just part of Dr. Ness's 200+ page report. She also conducted the full Bradford Hill analysis that the medical organizations and governmental bodies failed to do. Dr. Ness concluded that Bradford Hill's criteria "of consistency, dose-response, temporality, analogy, biologic plausibility, and coherence [were] met" and "that strength of association [was] partially met." A-7433. She believed "that specificity and experiment [were] not satisfied." A-7433.

In the end, Dr. Ness said that she "believe[d] causation (rather than bias, chance, or confounding) [wa]s the most likely explanation *even if one were to blinker*

*one's view to the set of diagnostic-endpoints studies alone.*" A-7426 (emphasis added). In other words, Dr. Ness made clear that she could provide a causation opinion even while playing by the District Court's flawed rules.

### C. The District Court Excluded Dr. Ness Based on Its Own View of the Science.

Yet even this was not enough for the District Court. Dr. Ness had addressed the *methodological* shortcomings that the District Court identified as its purported basis for excluding Plaintiffs' other experts. But the District Court's second *Daubert* opinion made clear that the experts' *conclusions*—and the District Court's own view of what the science really showed—was the true reason for exclusion.

Time and again, the District Court announced its own view that the science supporting causation was weak. For example, the District Court stated that "the state of scientific evidence on prenatal use of [APAP] presents a challenge for any expert witness offering the opinion that such use causes ADHD." SPA-214. The District Court stated that "given the state of the science[,] Dr. Ness confronted long odds in offering her opinion on causation." SPA-256. The District Court said "[i]t is challenging" for any scientist "to formulate a reliable dose-response study for [APAP] exposure during a pregnancy." SPA-251. The District Court endorsed the views of various organizations that have doubted causation, SPA-211–12, going so far as to parrot a National Institutes of Health press release interpreting a *single study* as showing that "[APAP] exposure during pregnancy is not linked to the risk of []

19

ADHD." SPA-213; *see also* SPA-214 ("Major medical organizations and regulators have cautioned against drawing causal inferences from the existing body of scientific literature."). And despite multiple independent scientists having published their views that the evidence supports causation, 916.Plaintiffs' Br. 11 (collecting studies), the District Court repeatedly made clear its personal stance that the evidence was too "heterogenous," 916.A-5524, "inconsistent," SPA-207, and "weak," 916.A-5571 (quotation omitted), to support that interpretation.

There is little doubt that, based on its own view of the science, the District Court would not permit *any* expert to opine that prenatal APAP exposure causes ADHD, no matter how qualified the expert and no matter how perfect her methodology. The District Court was not bashful about sharing its explanation for what *really* led to the repeatedly observed association between prenatal APAP exposure and ADHD: "genetic confounding." SPA-189. Specifically, the District Court decided that "there could be genetic factors that make pregnant people more likely to take [APAP] during pregnancy, and also make it more likely that their offspring will have ADHD." SPA-189. And in the District Court's telling, "any apparent association between [APAP] exposure and ADHD disappears altogether when genetic confounding is accounted for." SPA-256.

No amount of judicial acumen, however, even from a jurist as learned as the District Court judge here, equips a lay judge to make that sort of scientific judgment.

20

That is particularly so when many independent, peer-reviewed scientists have come to a contrary conclusion. *See* 916.Plaintiffs' Br. 48 ("genetics 'do not explain the association observed for [APAP] exposure'" (quoting 916.A-1389 (Liew (2018)))); *id.* (the "association 'is not explained by unmeasured familial factors'" (quoting 916.A-4535 (Stergiakouli (2016)))).

Dr. Ness, a decorated scientist herself, spent numerous pages of her report explaining why those independent scientists are right. Unmoved, the District Court held that Dr. Ness "fail[ed] to treat the evidence of genetic confounding adequately," SPA-231, "misse[d] the point" of studies that the District Court felt showed genetic confounding, SPA-233, and failed to "reliably assess genetic confounding." SPA-239.

The District Court did not stop there. Determined to validate its scientific judgment that this association was really due to genetic confounding, the District Court excluded Dr. Ness's opinions in part because she failed to consider the Ahlqvist (2024) study, which the District Court felt to be particularly compelling. But the Ahlqvist (2024) study was published *long after* Dr. Ness submitted her expert report. SPA-232 (noting the purported "failure to grapple with [the] Ahlqvist 2024" study). Indeed, about half of the District Court's discussion of genetic confounding is devoted to criticizing Dr. Ness for failing to discuss this study—a study that did not yet exist.

Despite Plaintiffs' argument in their Rule 702 brief that Dr. Ness could not have considered the study—so it obviously could not bear on the reliability of her methods and principles—the District Court held that it "w[ould] not ignore this study," and that it "must be taken seriously," apparently by the District Court, not an actual scientist trained to evaluate it. SPA-237.

The District Court brushed aside the glaring temporal problem by simply decreeing that it was empowered "to examine all of the submitted evidence in light of [the parties'] arguments." SPA-237. The results of the District Court's examination of a scientific publication, unaided by any analysis, testimony, or opinions from a credentialed scientist, were that the Ahlqvist study conclusively showed "the association between [APAP] use during pregnancy and neurodevelopmental disorders is a noncausal association." SPA-203 (cleaned up).[2] And thus any expert who offers a contrary opinion must be excluded.

To be sure, the District Court was careful to couch some of its opinion as being about methodological shortcomings. But in the main, the District Court put a new twist on the same fundamental error identified by Plaintiffs in Appeal No. 24-916.

---

[2] The District Court went on to approvingly quote the NIH press release suggesting that the study showed that "[APAP] exposure during pregnancy is not linked to the risk of autism, ADHD, or intellectual disability." SPA-213. Of course, many FDA scientists disagree and believe there is a causal association. *See* 916.A-804, 916.A-905; *see also* 916.A-4521, 916.A-4529 (Ji (2020)) (coauthored by a leading Health Resources and Service Administration epidemiologist).

The District Court would announce a scientific rule of its own making, provide no citation, and ignore practicing scientists (publishing in the peer-reviewed literature) who did exactly what the District Court said scientists could not do. *See* SPA-240–44 (creating a rule for consistency that independent scientists reject, 916.A-4650; A-8108 (Amrhein (2019))); SPA-254 (creating a rule for strength that independent scientists reject, 916.A-4648–49); SPA-246–47 (creating a rule for temporality that independent scientists reject, 916.A-4652); *see also* 916.Plaintiffs' Br. 4–5 & n.2 (describing how the District Court rejected scientific methodologies that "independent experts have already done and published in peer-reviewed journals").

### D. The District Court Weighed the Evidence and Granted Summary Judgment.

After the District Court excluded Dr. Ness's opinions, it ordered Plaintiffs to show cause why summary judgment should not be entered. MDL Dkt. 1496. Plaintiffs responded that, even without Dr. Ness's testimony, a reasonable jury could find causation based on testimony from Dr. Faraone, a *defense* expert who had not been challenged under Rule 702, and whose testimony was therefore admissible. MDL Dkt. 1497.

Those statements are detailed above. *See supra* pp. 9–12. Among other things, Dr. Faraone had previously stated that the "strongest evidence" for environmental factors that "increase the risk for ADHD" was for prenatal APAP exposure. 916.A-4799 (Khoury (2022)). He stated that there was "a weak, yet real,

association between maternal use of [APAP] while pregnant and subsequent ADHD . . . in the exposed child." A-8645 (emphasis removed). He described prenatal APAP exposure as a "[m]odifiable [e]nvironmental [r]isk [f]actor[]" for ADHD. 916.A-5348. Indeed, he described it as a "[c]ause[]" of that condition. 916.A-5347–48.

Dr. Faraone reaffirmed many of these statements at his deposition; agreed that there is indeed a 33% increased risk of ADHD from prenatal APAP exposure; that APAP has the "strongest evidence" of causation for an environmental cause of ADHD; and that there is "a weak, yet real association, between" prenatal APAP exposure "and subsequent ADHD . . . in the exposed child." 916.A-4315 (Tr. 363:10–12; 363:19–364:2); 916.A-4325 (Tr. 403:13–21); 916.A-4305 (Tr. 324:11–25). Based on this expert evidence from Dr. Faraone, Plaintiffs argued, a jury could find causation even without Dr. Ness or the other five experts.

The District Court rejected this argument and entered summary judgment for Defendants. Even though neither party had moved to exclude these Dr. Faraone opinions, the District Court still claimed a freestanding right to "ensure that an expert conducts a Bradford Hill analysis in a reliable manner." SPA-267. And because Dr. Faraone had not performed a Bradford Hill analysis in support of causation, the District Court held, Plaintiffs could not use his statements about causation as "reliable expert testimony as to general causation." SPA-267.

The District Court then held that "even if" Dr. Faraone's statements about causation were "admissible"—*i.e.*, able to survive a *Daubert* challenge that *nobody raised*—they would still "not permit a jury to find for plaintiffs on the element of general causation." SPA-269. To make this determination, the District Court weighed the statements by Dr. Faraone supporting Plaintiffs' position against other statements he made supporting Defendants' position and found the latter statements more persuasive. *See* SPA-270–75. Even though Dr. Faraone had called prenatal APAP exposure a "[c]ause[]" of ADHD, 916.A-5347–48, the District Court decided that "[w]hen read in context," "no reasonable jury could find . . . that prenatal exposure to [APAP] can cause ADHD in offspring" based on that testimony. SPA-270, SPA-275. Thus, "summary judgment [was] granted for defendants." SPA-275. This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.** A federal court is not entitled to exclude an expert based on disagreement with the expert's conclusions. Rather, it must examine only whether an expert's methods are applied the same way they are applied by experts outside the courtroom. Here, the District Court went far beyond that gatekeeping function. The District Court evaluated the underlying science itself, determined that prenatal APAP exposure does not *really* cause ADHD, and made clear that it would exclude *any*

25

expert who opined that it does—notwithstanding the quality of the methodology used to reach that opinion.

That was clear enough when the District Court excluded the first five experts. It is even clearer now. Dr. Ness's report addressed the methodological "flaws" that the District Court identified when excluding Plaintiffs' first five experts. Still, the District Court excluded her opinions. It invented new, non-scientific reasons for rejecting Dr. Ness's analysis, ignored what Dr. Ness said, and went so far as to exclude her for failing to discuss a study that *did not exist* when Dr. Ness submitted her report. The only reason a district court does that is because it is picking the "correct" scientific conclusion rather than assessing the reliability of an expert's methodologies. After all, a later-published study might well shed light on whether an expert's *conclusion* is correct, but it cannot (as a matter of temporal logic) suggest anything at all about the expert's *methodology*. The District Court's refusal to follow well-settled Rule 702 precedent was an abuse of discretion that warrants reversal.

**II.** When deciding whether to grant summary judgment, district courts must view the evidence in the light most favorable to, and draw all reasonable inferences for, the party against whom summary judgment may be entered. The District Court here did the opposite. Aside from Plaintiffs' experts, there was substantial evidence from *Defendants'* experts that supported finding that prenatal APAP exposure causes ADHD. For eight years—both before and after being hired by Defendants—

26

Dr. Faraone has said APAP exposure increases the risk of children having ADHD. In deciding to grant summary judgment anyway, the District Court had no choice but to recast that evidence, give Defendants the benefit of the doubt, and ultimately draw inferences in favor of Defendants rather than Plaintiffs. Rule 56 does not permit this. Because the evidence was sufficient for a reasonable jury to find general causation, the District Court erred by granting summary judgment.

## STANDARD OF REVIEW

This Court "review[s] the district court's admission of expert testimony for abuse of discretion," *United States v. Mejia*, 545 F.3d 179, 193 (2d Cir. 2008), but the district court's discretion "is not unfettered." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). An abuse of discretion occurs when the district court makes "an error of law" like applying "the wrong legal principle." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (citation omitted). And "[a] district court's legal interpretation of the Federal Rules of Evidence is reviewed de novo." *Carroll v. Trump*, 124 F.4th 140, 157 (2d Cir. 2024) (per curiam) (citation omitted).

This Court reviews the "grant of summary judgment de novo." *Peterson v. Bank Markazi*, 121 F.4th 983, 1009 (2d Cir. 2024) (citation omitted). When doing so, this Court must construe "all evidence in the light most favorable to the non-moving party." *Baltas v. Maiga*, 119 F.4th 255, 262 (2d Cir. 2024) (citation omitted). The Court "must resolve all ambiguities and draw all reasonable inferences against

27

the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted). There is a genuine dispute of material fact, "and summary judgment is therefore improper," if "a reasonable jury could decide in the non-movant's favor." *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 394 (2d Cir. 2023) (citation omitted).

## ARGUMENT

### I.     The District Court Erroneously Excluded Dr. Ness's Expert Opinions.

The opinions below make clear that the District Court had an agenda. It does not believe that prenatal APAP exposure causes ADHD, so it was determined to exclude any expert who said otherwise, no matter how qualified, no matter how much that opinion was echoed in the scientific literature, and no matter how closely the expert adhered to the methodological "rules" that the District Court itself laid down. The District Court is confident it is implementing sound public policy because it has decided that the repeatedly observed association between prenatal APAP exposure and ADHD is due to genetic confounding. A judge is entitled to hold that opinion in her personal capacity. But when deciding a *Daubert* motion, she cannot "engage in freeform factfinding, [] select between competing versions of the evidence, or [] determine the veracity of the expert's conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). District courts "must focus on the principles and methodology employed by the expert, without regard to

28

the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citation omitted). The record here shows that the District Court failed to stay within that limited judicial lane.

### A. Dr. Ness Addressed the Methodological "Flaws" That the District Court Identified.

If there were any doubt that the District Court was weighing the evidence with respect to the previous five experts—rather than simply evaluating methodologies—the opinion excluding Dr. Ness resolves it. Dr. Ness addressed every methodological "flaw" that the District Court previously raised.

For example, in the District Court's first *Daubert* opinion, it declared the before unheard-of scientific rule forbidding an epidemiologist from performing a Bradford Hill analysis on two related conditions (here, ASD and ADHD) at the same time. *E.g.*, 916.A-5615–21. That is wrong. 916.Plaintiffs' Br. 4–5. But Dr. Ness nonetheless focused her analysis on ADHD alone. A-7580 (Tr. 17:15–21).

In the District Court's first *Daubert* opinion, it applied the "rule" that only studies using confirmed ADHD *diagnoses* as endpoints could support a reliable causation opinion. *See* 916.A-5563. Wrong once again (as independent scientists, including Dr. Faraone, have shown), *see* 916.A-1527 (Vlenterie (2016)), but Dr. Ness limited herself to those kinds of studies, explaining that "causation (rather than bias, chance, or confounding) [was] the most likely explanation *even if one were to*

29

*blinker one's view to the set of diagnostic-endpoints studies alone*." A-7426 (emphasis added).

The District Court previously made clear its belief that the experts needed to say more about genetic confounding as part of their Bradford Hill analyses. *E.g.*, 916.A-5574; *but see* 916.Plaintiffs' Br 47–48 (explaining how the five experts properly addressed genetic confounding in a scientific way—not the way the District Court preferred). So Dr. Ness discussed this issue in even greater detail, candidly admitting that there was some evidence of genetic confounding at work, but explaining why it was very unlikely to explain the entire association. A-7422 (citing 916.A-4447 (Ricci (2023))).

In its first *Daubert* opinion, the District Court redefined "temporality" to require proving precisely when ADHD develops in the fetal brain. *See* 916.A-5576. So Dr. Ness applied this court-made definition and showed that temporality was still satisfied. As Dr. Ness said, "APAP appears to have its greatest impact on neurodevelopment in the third and possibly second trimester." A-7419 (citing Ystrom (2017), Chen (2019), Inoue (2021), Stergiakouli (2018), Liew (2014), Ji (2018), Gustavson (2019), Baker (2020), Ji (2020), Philippot (2017)). And because those trimesters (rather than the first trimester) were when the studies showed the greatest increase in risk, Dr. Ness determined that temporality was satisfied.

The District Court previously declared, again contrary to independent scientists including Dr. Faraone, that "dose response" cannot be satisfied unless there is milligram-level data available about dose. *See* A.916-5576–79. So Dr. Ness took that criticism head on, providing numerous examples of dose response analyses that used reliable proxies for dosage. Among others, the CDC uses other measures of exposure to evaluate dose response. It used days at Camp Lejeune (not gallons of water) when evaluating exposure to water contamination there. *See* A-7955 (ATSDR (2017)); A-8201 (Bove (2024)); *see also* A-8104 (Adesi (2013)) (National Cancer Institute showing that "duration of exposure" can be used as a proxy for "cumulative exposure"). This is the same thing that Dr. Ness did here by using the number of days of prenatal APAP exposure to proxy for the milligrams of APAP a baby was exposed to.

As detailed above, *see supra* pp. 14–18, for every "methodological" criticism that the District Court previously had leveled, Dr. Ness took them as a given, addressed them, and explained why she still was able to craft a reliable causation opinion. The District Court nevertheless excluded her testimony.

## B.    The District Court Excluded Dr. Ness Because It Disagreed With Her Conclusions.

The District Court revealed in plain terms its true reason for excluding Dr. Ness: "the state of the science," as the District Court viewed it. SPA-256; *see also* SPA-214 ("[T]he state of scientific evidence on prenatal use of [APAP] presents a

31

challenge for *any expert witness offering the opinion* that such use causes ADHD." (emphasis added)); *supra* p. 22.  In other words, the District Court made clear—quite explicitly—that it was focused on "the conclusions the expert has reached," *Amorgianos*, 303 F.3d at 266,—*i.e.*, "the opinion that such use causes ADHD," SPA-214—rather than "the principles and methodology employed by the expert." *Amorgianos*, 303 F.3d at 266 (holding that this is error (citation omitted)).

But a legion of *Daubert* cases—from this Court and others—makes plain that this is not a proper basis for excluding an expert.  *See, e.g.*, *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131, 1137 (2d Cir. 1995) (a *Daubert* court cannot play "amateur scientist[]" or "assess the weight of conflicting evidence" (citations omitted)); *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) ("[T]here is nothing in *Daubert* to suggest that judges become scientific experts, much less evaluators of the persuasiveness of an expert's conclusion."); *Elosu*, 26 F.4th at 1026 ("Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions."); *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (a district court may not "determine which of several competing scientific theories has the best provenance" (citation omitted)).

Meanwhile, numerous *actual* scientific authorities suggest that the science supports causation as the most likely explanation for the documented association

between prenatal APAP exposure and ADHD. *E.g.* 916.A-4488 (Bauer (2018)) ("Several lines of reasoning suggest that bias, confounding and chance are not solely responsible for the observed relationship[]" between prenatal APAP exposure and neurodevelopmental disorders.); John P. Jones III et al., *Evaluating the Role of Susceptibility Inducing Cofactors and of Acetaminophen in the Etiology of Autism Spectrum Disorder*, 14 Life 918, 1, 7 (2024) ("available evidence does not confirm [Ahlqvist's finding], but rather" "allow[s] us to conclude with no reasonable doubt that factors leading to susceptibility combined with [prenatal APAP] exposure cause many if not most cases of ASD").

Although not every scientist agrees with that interpretation, that simply shows that there is an ongoing "debate" about whether the association is causal or not. *Milward*, 639 F.3d at 22. And federal judges are not entitled to take sides in such debates via their *Daubert* orders. *See Elosu*, 26 F.4th at 1026 (a judge may not decide "a battle of the experts . . . by judicial fiat" (citation omitted)); *United States v. Bohle*, 475 F.2d 872, 874 (2d Cir. 1973) (a *Daubert* court may not resolve a "battle[] of experts" (citations omitted)); *Realtime Data, LLC v. Morgan Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate." (citation omitted)). But that is what the District Court did here.

33

Nowhere is this more apparent than in the District Court's discussion of genetic confounding. It excluded the first five experts in large part because they did not "adequately" address genetic confounding, even though they spent dozens of pages explaining exactly why they did not believe it undermined their causation opinions. *See* 916.Plaintiffs' Br. 47 (Dr. Baccarelli spent "more than 12 pages in his original report and 10 pages more in [his] rebuttal report" explaining his view on genetic confounding. (citing 916.A-1854–66, 916.A-2875–85)). So Dr. Ness spent even more pages on the subject, explaining in great detail why causation (rather than genetic confounding) was the most likely explanation for the full set of results in the literature. A-7286; A-7292–94; A-7297; A-7302–03, A-7305–06; A-7311; A-7321–23; A-7344; A-7422–27. This was not enough for the District Court. Yet again, the District Court held that Dr. Ness had "fail[ed] to treat the evidence of genetic confounding adequately." SPA-231.

There is only one fair reading of these orders. The District Court's objection has nothing to do with the "adequacy" of the *discussion* of genetic confounding and everything to do with the District Court's *conclusion* that "any apparent association between [APAP] exposure and ADHD disappears altogether when genetic confounding is accounted for." SPA-256; *see* SPA-237. Thus, the District Court made clear that it will exclude any expert who offers a different "conclusion" about genetic confounding no matter the "principles and methodology" used to support

that conclusion. *Amorgianos*, 303 F.3d at 266 (holding that this is error (citation omitted)).

This reading is confirmed by the District Court's treatment of the Ahlqvist (2024) study. That study purported to show that the association between prenatal APAP exposure and ADHD disappeared after using so-called sibling controls, suggesting (in the authors' view) that some genetic confounding may be at work. Although that study has been roundly criticized on methodological grounds,[3] the merits of the study are irrelevant. What matters is the date. The Ahlqvist study was published *after* Dr. Ness submitted her expert report. An expert cannot betray her principles and methods for failing to consider evidence that did not yet exist when the expert rendered her opinion. But that impossible-to-satisfy standard is exactly what the District Court held Dr. Ness to. SPA-232. The only reason for that holding is that the *conclusion* of that study conflicted (in the District Court's view) with the

---

[3] One independent scientist said that the Ahlqvist "estimates [were] severely biased by non-shared confounders." Daniel W. Cramer, *Acetaminophen Use During Pregnancy*, 332 JAMA 338, 338 (2024) (quotation omitted). Ahlqvist also hid the "Swedish Medical Association['s] suggest[ion that women] avoid[ APAP] during pregnancy." *Id.* at 339. Thus, fellow scientists think the Ahlqvist authors did "a disservice" to the community. *Id.* Another group of scientists said that "available evidence does not confirm [Ahlqvist's finding], but rather suggests that [APAP] use during pregnancy might cause neurodevelopmental problems." Jones, *supra* p. 7. They added that the Ahlqvist authors oversold the study's findings because the results show that "the vast majority of the risk was eliminated by adjusting for inflammation-associated factors in the analysis, not by adjustment for the sibling pairs." *Id.* In other words, there really was no new finding on genetic confounding.

conclusion that Dr. Ness reached. SPA-237 (District Court stating that it needed "to examine all of the submitted evidence in light of [the parties'] arguments"); SPA-203 (characterizing the Ahlqvist study as showing "that the association between [APAP] use during pregnancy and neurodevelopmental disorders is a noncausal association").

Plaintiffs are aware of no cases in which this Court has blessed an order excluding expert opinions because of the conclusion that the expert reached. This case should not be the first. Affirming will upend Rule 702, converting it into a vehicle for district courts to wade into and resolve scientific debates under the guise of assessing methods and principles. In addition to deputizing lay judges to perform tasks they are untrained for, the mismatch between the stated rationale and the actual *ratio decidendi* will undermine confidence in the judiciary.

### C. The District Court's Remaining Methodological Criticisms Were Based on Scientific Rules of Its Own Making.

In its second *Daubert* opinion, the District Court quoted the Supreme Court's maxim that "conclusions and methodology are not entirely distinct from one another." SPA-219 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). But *Joiner*'s observation is not an invitation for the District Court to draw its *own* scientific conclusions. All the Supreme Court said was that an expert conclusion that is "connected to existing data only by the *ipse dixit* of the expert" can be excluded. 522 U.S. at 146. That is obviously not what happened here. Dr. Ness did

36

not stake out some fringe position, announcing a conclusion bereft of any scientific data. She instead painstakingly and reliably defended her side of a scientific debate—a side that counts numerous independent scientists as fellow travelers—that the District Court disagrees with.

Attempting to characterize that disagreement as a sign that Dr. Ness betrayed her own methodologies was bound to pervert sound scientific practices. As it did with respect to the first five experts, the District Court repeatedly laid down scientific rules of its own making, without any citation, *see Milward*, 639 F.3d at 22–23, and in the face of actual scientists who do things in exactly the way the District Court said was forbidden. Plaintiffs have explained why this constitutes reversible error as a misinterpretation of Rule 702. *See* 916.Plaintiffs' Br. 3. It did not matter that Dr. Ness had addressed the District Court's earlier invented rules. The District Court invented rules as needed to reach its predetermined outcome.

For example, with respect to consistency, on the District Court's view, any "heterogeneity" in results means that the consistency criterion cannot be satisfied. SPA-240–44. The District Court provided no citation for that proposition, nor could it. "Heterogeneity" is a technical term of art in the field that has nothing to do with whether a literature is consistent or not. *See* Timothy Lash et al., *Modern Epidemiology* 919 (4th ed. 2021). And Plaintiffs have catalogued elsewhere the numerous scientists who have viewed *this literature* as consistent despite the

purportedly *verboten* "heterogeneity." 916.Plaintiffs' Br. 33–34. Even Dr. Faraone, a *defense* expert, stated that a roughly 30% association between APAP and ADHD has been repeatedly observed in the literature. 916.A-4315 (Tr. 363:10–12, 363:19–364:2).

As to the strength criterion, the District Court did not disagree with Dr. Ness's conclusion that the strength of association was "modest" and the criterion was "partially met." SPA-254. Still, it held that the criterion "does not support a finding of causality." SPA-254. This was error, as explained previously. 916.Plaintiffs' Br. 34–35.

With respect to biological plausibility, the District Court rejected Dr. Ness's analysis because "[h]er opinion on a potential biological mechanism, which is largely derived from her reading of animal studies, is flawed for the same reasons as those of plaintiffs' prior experts: it fails to reliably fill critical gaps in the purported mechanistic pathway." SPA-255. This reduces to a requirement that biological plausibility cannot be satisfied unless the mechanism is known with certainty. But the District Court provided no citation for that "rule." And that is not the way independent scientists view the biological plausibility criterion. 916.Plaintiffs' Br. 41–44. That is why even *Defendants'* expert, Dr. Faraone, stated that it makes "biological sense, that [APAP] exposure during pregnancy could cause ADHD." 916.A-4307 (Tr. 331:19–332:4).

As to dose response, the District Court repeated its requirement that only milligram-level data would suffice. SPA-251–52. That rule of science was apparently unknown to Dr. Faraone, who relied on some of the same literature Dr. Ness did to conclude that there is "a dose-response relationship between maternal prenatal use of [APAP] and ADHD." 916.A-4772 (Faraone (2021)). Dr. Faraone could reach this conclusion consistent with sound scientific practices because there is no scientific authority *anywhere* outside the District Court's courtroom that requires doses to be measured precisely. 916.Plaintiffs' Br. 39–41. Indeed, dose is often measured through proxies, such as days spent at Camp Lejeune. *See* A-7406–07 (citing A-7951 (ATSDR (2017))). The District Court's conjured rule for this criterion is particularly problematic, as many epidemiologists consider "a dose-response relationship [a]s 'the single most important'" piece of evidence for causation. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1339 (11th Cir. 2010) (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (citing David L. Eaton, *Scientific Judgment and Toxic Torts-A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & Pol'y 5, 11 (2003))).

These illustrative examples highlight the District Court's larger error. Convinced that this association is not causal—and that the true culprit is genetic confounding—the District Court reverse engineered a series of methodological "flaws" of its own "making." *Milward*, 639 F.3d at 22 (citation omitted). But when

39

applying Rule 702, a District Court may not make up its own rules of science—and exclude an expert for violating them—when actual scientists do things the way the expert did. *See* 916.Plaintiffs' Br. 3; *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1045 (9th Cir. 2014) ("[A party] may satisfy its burden of establishing that the evidence is scientifically valid by pointing to some objective source to show that the conclusions are based on scientific method, as it is practiced by (at least) a recognized minority of scientists in the field." (cleaned up)). The District Court's exclusion of Dr. Ness should be reversed.

## II. The District Court Erred By Granting Defendants Summary Judgment Because Plaintiffs Could Prove Causation Through Defendants' Experts.

Entirely apart from Dr. Ness's opinion, Plaintiffs offered *other* expert evidence of causation—specifically, evidence from Defendants' own experts. Much of this evidence *directly* contradicts the District Court's criticisms of Dr. Ness's Bradford Hill analysis. As detailed above, materials that Dr. Faraone previously authored—and testimony that he then gave during his deposition—provide evidence from which a reasonable jury could conclude that prenatal APAP exposure causes ADHD. *See supra* pp. 9–12. Most glaringly, Dr. Faraone created a PowerPoint presentation in which he said that one of the "causes of ADHD" was APAP "exposure[] to the fetus." 916.A-5347–48 (capitalization altered). There are numerous other examples of similar statements and testimony from Dr. Faraone, *i.e.*, statements and testimony suggesting that prenatal APAP exposure causes ADHD.

40

*See supra* pp. 9–12. Another defense expert, Dr. Kolevzon, co-authored a textbook chapter concluding that "several prenatal exposures . . . emerge as potential risk factors for" neurodevelopmental disorders, including "[m]ost notably . . . prenatal use of [APAP]." 916.A-4843.

No party challenged these opinions of Dr. Faraone or Dr. Kolevzon under Rule 702, and the District Court cannot raise the issue *sua sponte*. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Plaintiffs would be entitled to call these experts at trial, elicit their testimony, and cross-examine them with their previous statements. And Plaintiffs would likely be entitled to offer their previous statements as freestanding "admission[s] of a party opponent." *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (citing *Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 424–25 (1997)).

The question for the District Court was therefore a straightforward one (and one this Court reviews de novo): Based on these statements, could a reasonable jury find that prenatal APAP exposure can cause ADHD? The answer is obviously "yes," especially when "construing the evidence in the light most favorable to [Plaintiffs] and drawing all reasonable inferences in [their] favor." *Ezrasons,* 89 F.4th at 394 (quotation omitted). When even the *Defendants'* experts say that prenatal APAP exposure causes ADHD, a "reasonable jury" is entitled to believe them. *Lucente v.*

41

*County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020) (citation omitted). The District Court therefore erred by granting summary judgment.

In resisting this conclusion, the District Court offered a series of non-sequiturs.

*First*, the District Court stated that "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because" causation "is generally not within the sphere of the common knowledge of the lay person." SPA-266 (quoting *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999)). Fair enough. But Drs. Faraone and Kolevzon *are in fact experts*. Their qualifications to offer causation opinions are unchallenged. Take it from the District Court: "Dr. Faraone is a world-renowned expert on ADHD." SPA-268.

Plaintiffs are not suggesting that they would be entitled to present a causation case without *any* expert testimony at all, asking a lay jury to piece together scientific evidence based on "common knowledge" alone. *Barnes*, 202 F.3d at 159. But there is no requirement that the testifying expert must be paid for *by Plaintiffs*. Quite the opposite. Numerous cases hold that a party may make its case by using the other side's witnesses. *See SEC v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009) ("A witness identified as a testimonial expert is available to either side; such a person can't be transformed after the report has been disclosed, and a deposition conducted."); *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, No. 17-1136(RAM), 2021

42

WL 3134482, at *5 (D.P.R. July 23, 2021); *see also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 351 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 113 (2d Cir. 2020); *Anderson v. Metro-N. Commuter R.R. Co.*, No. 3:14-cv-452 (JBA), 2016 WL 2755910, at *2–3 (D. Conn. May 11, 2016). Defendants almost certainly regret offering experts who stated that prenatal APAP exposure causes neurodevelopmental disorders, including ADHD. But Plaintiffs are nevertheless entitled to use their testimony to prove general causation.

*Second*, the District Court pointed out that Dr. Faraone did not conduct a Bradford Hill analysis demonstrating that there is a causal association between prenatal APAP exposure and ADHD. *See* SPA-267–70. True but irrelevant. Although a Bradford Hill analysis is *one method* of evaluating causation, it is far from the only one. *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017); Joseph Sanders et al., *Differential Etiology: Inferring Specific Causation in the Law from Group Data in Science*, 63 Ariz. L. Rev. 851, 864 n.46 (2021) (noting there are other reliable methods for proving causation (citation omitted)). And more fundamentally, the underlying method of evaluating causation matters *only* when a court is adjudicating a *challenge* to admissibility. Here, there is no question that the experts' statements are admissible because *no party has challenged them*. The only question is whether a "reasonable

43

jury" could find causation based on those statements after making all inferences in favor of causation. As explained above, a reasonable jury could make that finding.

*Third*, the District Court pointed out that some of the evidence from Defendants' experts "do[es] not even refer to [APAP. Rather it] speak[s] more generally to the fact that environmental risk factors may contribute to the development of ADHD." SPA-270–71. But that ignores that much of the evidence *does* in fact refer to APAP specifically. *E.g.*, 916.A-5347–48 (listing APAP "exposure[] to the fetus" as a "cause[] of ADHD" (capitalization altered)). That evidence, especially when combined with the statements about environmental risk factors, would allow a reasonable jury to find causation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that a court must "review the record 'taken as a whole'" when evaluating summary judgment (citation omitted)).

*Fourth*, the District Court generously found that the experts' statements could be read in a more Defendant-friendly way. In the District Court's telling, the statements supporting causation "merely acknowledge that studies have documented an *association* between prenatal [APAP] exposure and ADHD." SPA-271 (emphasis in original). It is hard to see how a slide deck discussing the "[c]auses of ADHD" is merely referring to an association. Or how depicting APAP as a "[m]odifiable [e]nvironmental [r]isk [f]actor[]" for ADHD fits the District Court's

44

characterization. 916.A-5347–48. But even if the District Court's strained reimagination of the prior statements was *possible*, it is obviously not the *only* inference a reasonable fact finder could draw. The contrary holding when the evidence is so obviously susceptible to Plaintiffs' interpretation illustrates the lengths to which the District Court went to avoid submitting this case to a jury.

Doubling down on this approach, the District Court decided that "when read in context," Dr. Faraone did not really mean that prenatal APAP exposure causes ADHD when he said that prenatal APAP exposure causes ADHD. SPA-270. To achieve this bare faced rejection of Dr. Faraone's own words, the District Court first credited Dr. Faraone's testimony that "risk factor" simply means "correlate" rather than cause. SPA-272. The District Court then credited Dr. Faraone's testimony that when he said "cause" he really meant "risk factor." SPA-272. And thus the District Court decided that when Dr. Faraone said "cause," he must have *really* meant that there was merely a "correlation"—*i.e.*, an association—between prenatal APAP exposure and ADHD, but not causation. SPA-272.

None of the District Court's maneuvering was about reading statements in "context." It was all an effort to accept Defendants' self-serving explanations for damning, contrary testimony, which a court may not do. *See Palin*, 113 F.4th at 264 ("A district court may not credit [a party's] self-serving explanations or adopt possible exculpatory interpretations on [its] behalf when interpretations to the

contrary exist."). To begin with, a reasonable jury could easily disbelieve Dr. Faraone's post hoc assertion (made during his deposition) that a "risk factor" is merely a synonym for "correlate." Disbelief is easy because the assertion is false. The reference manual published by the Federal Judicial Center and other authorities define "risk factor" as an "agent," *i.e.*, "drug, microorganism, chemical substance, or form of radiation, whose presence or absence *can result in* the occurrence of a disease." Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 619 (3d ed. 2011) (emphasis added). To be a risk factor, "correlation" alone is not enough, which means (at best) Dr. Faraone misspoke multiple times previously. Viewed in the light most favorable to Plaintiffs, those litigation-driven excuses cannot support summary judgment for Defendants.[4]

Shifting from the pretext of "context," the District Court moved to an equally unavailing rationale: quantity. Dr. Faraone had only a "smattering" of statements that could be seen as supporting Plaintiffs' general causation theory, and that was insufficient as a matter of law. SPA-275. This "he-only-proved-Plaintiffs'-case-a-few-times" position is a ludicrous distortion of Rule 56. An expert who reliably says

---

[4] Indeed, outside of litigation, Dr. Faraone referred to APAP as a "*modifiable* environmental risk factor." 916.A-5348 (capitalization altered; emphasis added). The reason for the word "modifiable" is to indicate that a "modification" in behavior will produce a reduction in risk. If Dr. Faraone truly believed that prenatal APAP exposure was merely correlated with ADHD but had no causal connection, modifying the behavior would *not* reduce risk.

a *single time* that prenatal APAP exposure causes ADHD is enough to permit a reasonable jury to conclude that prenatal APAP exposure causes ADHD. In any event, Dr. Faraone has eight years' worth of repeated statements that support Plaintiffs' case. 916.A-4822 (Joseph (2015)); 916.A-4325 (Tr. 403:13–21); A-8645, A-8784, A-8786–88. No case should ever reach a jury if district courts may simply tally the plaintiffs' evidence and the defendants' evidence and declare the winner based on volume. The District Court's grant of summary judgment must be reversed. *See Palin*, 113 F.4th at 264.

## CONCLUSION

This Court should reverse the District Court's judgment.

47

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,582 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft 365 Word in Times New Roman 14-pt font.

Dated this 20th day of January, 2025.

*/s/ Ashley Keller*
Ashley Keller
KELLER POSTMAN LLC
*Attorney for Plaintiffs–Appellants*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order granting Defendants' Rule 702 Motion,
dated July 10, 2024 .......................................... SPA-175

Opinion and Order granting Summary Judgment,
dated August 20, 2024 ....................................... SPA-259

Final Judgment, dated August 21, 2024............................ SPA-277

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
                                 :
                                 :          22MD3043 (DLC)
IN RE: Acetaminophen – ASD-ADHD  :          22MC3043 (DLC)
Products Liability Litigation    :
                                 :          OPINION AND
                                 :             ORDER
-------------------------------- X
```

APPEARANCES:

For plaintiffs:
Keller Postman LLC
Ashley C. Keller
Ashley Barriere
150 N. Riverside Plaza, Ste. 4100
Chicago, IL 60606

Bernstein Liebhard LLP
Daniel C. Burke
10 East 40th St
New York, NY 10016

Wagstaff & Cartmell, LLP
Lindsey Scarcello
4740 Grand Avenue, Ste 300
Kansas City, MO 64112

For defendants:
Barnes & Thornburg LLP
Kristin L. Richer
Jessica L. Brennan
2029 Century Park East, Suite 300
Los Angeles, CA 90067

King & Spalding LLP
Kristen R. Fournier
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

Skadden, Arps, Slate, Meagher & Flom LLP
Jessica Davidson
One Manhattan West
New York, NY 10001

Procedural Background.......................................... 3
  I.   MDL Consolidation, Motions to Dismiss ................... 3
  II.   Proposed Label Change & FDA Involvement ............... 4
  III.  General Causation Discovery ........................... 5
Factual Background............................................. 7
  I.   Acetaminophen and its Regulation ....................... 7
  II.   ADHD .................................................. 9
  III.  Epidemiology ......................................... 11
    A.   Interpreting Observational Study Results ............. 12
    B.   Causation ............................................ 17
  IV.   Types of Evidence at Issue Here ...................... 18
    A.   Published Studies .................................... 18
    B.   Statements by Governmental Bodies, Medical Societies,
    and other Associations ................................... 31
Discussion................................................... 39
  I.   Standard: Daubert and Rule 702 ........................ 40
  II.   Epidemiology Cases ................................... 46
  III.  Dr. Ness ............................................. 50
    A.   Qualifications ....................................... 54
    B.   Reliability .......................................... 57
Conclusion................................................... 84

DENISE COTE, District Judge:

This Opinion addresses the Rule 702 motion filed on March
29, 2024 by the defendants in this multidistrict products
liability litigation ("MDL").  A prior Opinion excluded the
testimony of the five expert witnesses on whom the plaintiffs
had previously relied, each of whom opined that prenatal
exposure to acetaminophen causes attention deficit hyperactivity
disorder ("ADHD") and autism spectrum disorder ("ASD").  In re

Acetaminophen - ASD-ADHD Prods. Liab. Litig., --- F. Supp. 3d. ---, No. 22md3043 (DLC), 2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023) ("First Daubert Opinion").

Plaintiffs in more recently filed actions rely on another expert, Dr. Roberta Ness. Dr. Ness opines that prenatal exposure to acetaminophen causes ADHD. For the following reasons, the defendants' motion to preclude the testimony of Dr. Ness is granted.

## Procedural Background

Familiarity with prior Opinions in this MDL, particularly the First Daubert Opinion, is assumed. This Opinion summarizes only those facts relevant to this motion. Nevertheless, much of the factual and procedural background in this Opinion is drawn from the First Daubert Opinion.

I. MDL Consolidation, Motions to Dismiss

This litigation began in 2022, when plaintiffs -- children, parents, and guardians who alleged injuries from the development in children of ASD and ADHD due to a mother's prenatal use of acetaminophen -- began to file products liability lawsuits in federal courts. Plaintiffs sued the manufacturer of Tylenol (Johnson & Johnson Consumer Inc.) and retailers of store-branded acetaminophen products, alleging that the defendants' labeling

practices for acetaminophen were deficient under various state laws.

In October of 2022, the Judicial Panel on Multidistrict Litigation consolidated plaintiffs' cases and transferred the cases to this Court under 28 U.S.C. § 1407.  This MDL has included hundreds of cases.  Motions to dismiss individual actions on the ground of preemption were denied in November 2022 and April 2023.[1]  Additional motions to dismiss were addressed in April and May of 2023.[2]

II.  Proposed Label Change & FDA Involvement

On April 7, 2023, in response to a request from the Court, the plaintiffs submitted proposed language for a label change for the acetaminophen products then at issue in this litigation ("Plaintiffs' Proposed Warning").  The Plaintiffs' Proposed Warning was:

> **Autism/ADHD:** Some studies show that frequent use of this product during pregnancy may increase your child's risk of autism and attention deficit hyperactivity disorder.  If you use this product during pregnancy to treat your pain and/or fever, use

---

[1] In re Acetaminophen – ASD-ADHD Prods. Liab. Litig., No 22md3043 (DLC), 2022 WL 17348351 (S.D.N.Y. Nov. 14, 2022) ("Preemption Opinion I"); In re Acetaminophen – ASD-ADHD Pros. Liab. Litig., No 22md3043 (DLC), 2023 WL 3026412 (S.D.N.Y. Apr. 20, 2023).

[2] In re Acetaminophen – ASD-ADHD Prods. Liab. Litig., No. 22md3043 (DLC), 2023 WL 3045802 (S.D.N.Y. Apr. 21, 2023); 2023 WL 3126589 (S.D.N.Y. Apr. 27, 2023); 2023 WL 3126636 (S.D.N.Y. Apr. 27, 2023); 2023 WL 3162623 (S.D.N.Y. Apr. 28, 2023); and 2023 WL 3467057 (S.D.N.Y. May 15, 2023).

# SPA-179

the lowest effective dose for the shortest possible time and at the lowest possible frequency.

Because this MDL raises important issues related to public health and drug safety for pregnant women and their offspring, the Court invited the United States, including the Food and Drug Administration ("FDA"), to submit its views on the Plaintiffs' Proposed Warning.  On September 8, as the parties were about to file their initial Rule 702 motions, the United States responded to the invitation.  The Government declined to submit a Statement of Interest but noted in its letter the FDA's independent 2023 conclusion (discussed in more detail <u>infra</u>) that the scientific evidence on this topic is as of yet "unable to support a determination of causality."

III. General Causation Discovery

All fifty states require some evidence of general causation in products liability cases involving medical issues.  <u>See</u> <u>In re Mirena IUS Levonorgestrel-Related Products Liability Litigation</u>, 982 F.3d 113, 124 (2d. Cir. 2020) ("<u>Mirena II</u>").  At a pretrial conference on December 2, 2022, the Court proposed, and the parties agreed, to conduct discovery related to general causation first; if the plaintiffs' experts on the issue of general causation survived Rule 702 motions, the remainder of discovery would proceed.  The initial Rule 702 motions were fully submitted on October 20, 2023.  Oral argument on the

# SPA-180

defendants' motions to strike the plaintiffs' expert reports was held on December 7, 2023.[3]

On December 18, 2023, the First Daubert Opinion was issued. It excluded the proposed testimony of five experts: Drs. Andrea Baccarelli, Robert Cabrera, Eric Hollander, Brandon Pearson, and Stan Louie, each of whom was tendered in support of a transdiagnostic opinion that prenatal exposure to acetaminophen causes both ASD and ADHD.[4]  Pursuant to an Order to Show Cause process, final judgment was entered in approximately 550 cases in the MDL, specifically those cases in which a Short Form Complaint was served on or before January 11, 2024.  Those plaintiffs have appealed.

On February 1, the plaintiffs in several newly-filed actions advised the Court that they had retained their own

---

[3] The Court did not require testimony from any of the expert witnesses.  See Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (noting trial court has "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability").

[4] Dr. Hollander defined a transdiagnostic process as a "mechanism that underlies and connects a group of disorders that transcends traditional diagnostic boundaries" and opined that "it is appropriate to review the body of evidence that measures symptoms of neurodevelopmental disorders and to not limit the analysis to studies that focus on ASD and ADHD as specified outcomes when evaluating the potential causal association between prenatal [acetaminophen] exposure and ASD and ADHD in offspring."

6

expert, Dr. Roberta Ness, who offers opinion testimony on general causation as to ADHD only.  Over the objection of the defendants, the Court permitted these plaintiffs to substitute Dr. Ness as their general causation expert.  Defendants' Rule 702 motion to exclude opinions offered by Dr. Ness was fully submitted on June 11, 2024.

### Factual Background

Before addressing the defendants' Rule 702 motion, this Opinion sets out background information relevant to the motion.  This background information describes 1) acetaminophen and its regulation; 2) ADHD and its characteristics; 3) the basics of epidemiological evidence; 4) the types of scientific research and the principal studies on which Dr. Ness has relied; and 5) the assessments, statements and conclusions of various medical and governmental bodies on the issue at stake in this motion.

I.   Acetaminophen and its Regulation

Acetaminophen (sometimes referred to as "APAP" in the literature) is the active ingredient marketed for the relief of fever and pain in Tylenol and certain other over-the-counter pain relievers.  Untreated fever during pregnancy is associated with poor pregnancy outcomes, and untreated pain can result in depression, anxiety, and high blood pressure in the mother.  <u>See</u>

FDA 2022[5] at 33; see U.S. Food and Drug Administration, <u>FDA has reviewed possible risks of pain medicine use during pregnancy</u> (Jan. 9, 2015), at perma.cc/4JY6-CN6V.  Acetaminophen is considered the only pain reliever and fever reducer indicated for use during pregnancy because of the risks of miscarriage or birth defects associated with other analgesics like NSAIDS. About 60% of pregnant women in the U.S. are estimated to use acetaminophen.  <u>FDA 2022</u> at 5.  Acetaminophen can cross the placental barrier and can thus enter fetal circulation.  Ricci et al., <u>In Utero Acetaminophen Exposure and Child Neurodevelopmental Outcomes: Systematic Review and Meta-</u>

---

[5] As will be discussed in detail <u>infra</u>, the FDA has reviewed scientific literature pertinent to this litigation several times.  The FDA's internal reviews include: Taylor & Wang, <u>Review of Study of Acetaminophen Use in Pregnancy and Risks of ADHD in Offspring</u>, U.S. Food and Drug Administration (May 15, 2014) ("<u>FDA 2014</u>"); Mosholder et al., <u>Acetaminophen Use in Pregnancy and ADHD in Offspring</u>, U.S. Food and Drug Administration (Mar. 18, 2015) ("<u>FDA 2015</u>"); Mosholder, <u>Neurodevelopmental Outcomes Following Prenatal Acetaminophen Exposure</u>, U.S. Food and Drug Administration (Oct. 14, 2016) ("<u>FDA 2016</u>"); Nguyen & Gassman, <u>Memorandum of Consultation: Public Communication About In Utero Acetaminophen Exposure And The Potential For Adverse Neurodevelopmental Outcomes</u>, U.S. Food and Drug Administration (Feb. 10, 2017) ("<u>FDA 2017</u>"); Abraham et al., <u>Functional Neurobehavioral Outcomes and Urogenital Outcomes Associated with Prenatal Acetaminophen Exposure</u>, U.S. Food and Drug Administration (Jul. 15, 2022) ("<u>FDA 2022</u>"); Abraham et al., <u>Updated Literature Review of Studies that Examine the Association Between Acetaminophen Exposure During Pregnancy and Neurobehavioral or Urogenital Outcomes</u>, U.S. Food and Drug Administration (Mar. 10, 2023) ("<u>FDA 2023</u>").

Analysis, 37 Paediatr. Perinat. Epidemiol. 473, 474 (2023)
("Ricci 2023").

Since 1982, all over-the-counter drugs intended for
systemic absorption must include a general pregnancy warning:
"**If pregnant or breast-feeding**, ask a health professional before
use."  21 C.F.R. § 201.63; see Preemption Opinion I, 2022 WL
17348351, at *6 (noting requirement that first four words be in
bold type).  Acetaminophen, which is systemically absorbed, is
among the drugs whose labelling must include this warning.  The
governing regulations require no additional warning related to
pregnancy for acetaminophen products.  See U.S. Food and Drug
Administration, Over-the-Counter (OTC) Monograph M013: Internal
Analgesic, Antipyretic, and Antirheumatic Drug Products for
Over-the-Counter Human Use (Oct. 14, 2022).

II.  ADHD

ADHD is a neurodevelopmental disorder ("NDD").  Diagnostic
and Statistical Manual of Mental Disorders (5th ed., Text
Revision, 2022) ("DSM") at 70.  Its essential feature is a
persistent pattern of inattention and/or hyperactivity-
impulsivity that interferes with functioning or development.
Id.  Inattention typically manifests as wandering off task,
failing to follow through on instructions or finishing work or
chores, having difficulty sustaining focus, and being

disorganized.  Id.  Hyperactivity refers to excessive motor
activity when it is not appropriate.  Id.  Impulsivity refers to
hasty actions that occur in the moment without forethought;
impulsive behaviors may manifest as social intrusiveness or
making decisions without consideration of long-term
consequences.  Id.

ADHD begins in childhood, and several symptoms must be
present by age 12 for diagnosis.  Id. at 70.  Further, children
must show symptoms in more than one setting (e.g., home and
school or home and work), and confirmation of substantial
symptoms across settings typically cannot be done accurately
without consulting informants who have seen the individual in
those settings.  Id.  The prevalence of ADHD is estimated to be
about 7.2% of children worldwide, although prevalence ranges
widely from country to country (from 0.1% to 10.2%).  Id. at 71.

According to the DSM, the precise cause of ADHD is unknown.
There is no biological marker for diagnosing ADHD.  Id. at 72.
While some neuroimaging studies have shown differences in
children with ADHD compared with control subjects, meta-analyses
of all neuroimaging studies do not show differences, likely due
to differences in diagnostic criteria as well as technical
aspects of the neuroimaging technique.  Id.  Heritability, a
measure of how much variation in a trait at the population level

is due to genetic influence, rather than environmental factors, is estimated to be about 74%.  Id. at 71.  While there is no single gene for ADHD, studies have identified a number of genes that may be associated with ADHD, as well as several environmental risk factors, including low birthweight, prenatal exposure to smoking, and possibly diet.  Id.

III. Epidemiology

Epidemiology is the study of the causes, incidence, and distribution of diseases.  Epidemiological studies attempt to determine whether an agent is related to the risk of developing a certain disease.  Reference Manual on Scientific Evidence (3d ed. 2011) ("RMSE") at 555.  Due to ethical constraints, most epidemiological studies are observational, rather than experimental.  In an observational study, the authors compare the rate of disease among a group of subjects who have been exposed to the agent of interest and compare that rate with that of an unexposed control group.  Id. at 556.

Two major types of observational studies are cohort studies and case control studies.  In cohort studies, researchers define a study population without regard to the participants' disease status, then classify the study participants into groups based on whether they were exposed to the agent of interest.  Id. at 557.  Cohort studies can be prospective (the cohort is defined

in the present and followed forward into the future, and the proportions of individuals in each group who develop the disease of interest are compared) or retrospective (the researcher determines the proportion of individuals in the exposed group who developed the disease from available records or evidence and compares that proportion with the proportion of another group that was not exposed).  Id.

In case-control studies, the researcher begins with a group of individuals who have a disease ("cases") and then selects a similar group of individuals who do not have the disease ("controls").  Id. at 559.  The researcher then compares the groups in terms of past exposures.

A.   Interpreting Observational Study Results

Because observational studies do not control for exposure to other risk factors for disease, their results must be interpreted with some caution.  "[T]he first question an epidemiologist addresses is whether an association exists between exposure to the agent and disease."  Id. at 566.  If an association is found, its strength can be stated in several ways, including risk ratios ("RR") or odds ratios ("OR"), which represent the ratio of the incidence rate of disease in exposed individuals to the incidence rate in unexposed individuals.  If the risk ratio equals 1.0, the risk in exposed individuals is

# SPA-187

the same as the risk in unexposed individuals.  Id. at 567.  If it is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals; in other words, there is a positive association between exposure to the agent and the disease, which may or may not be causal.  Id.  If it is less than 1.0, there is a negative association between exposure and disease, which may or may not reflect a protective effect of the agent on risk of disease.  Id.  An association (negative or positive), without more, should be interpreted with caution; further analysis must be conducted to assess whether the association is real or is instead a result of chance, confounding, or bias.  Id. at 567-68.

      1.   Chance

Chance, or random error, is evaluated through measures of statistical significance, which is usually reported using a range of values referred to as the "95% confidence interval" ("CI").  The CI encompasses the results we would expect 95% of the time if samples for new studies were repeatedly drawn from the same population.  All other things being equal, the larger the sample size, the narrower the confidence interval.  Id. at 581.  The narrower the CI, the more statistically stable the results of the study.  Id. at 580.  If a CI crosses 1.00, the result is not considered statistically significant.  For

# SPA-188

example, if a study found a risk ratio of 1.5 with a 95% CI of 0.08-3.4, the result is not statistically significant because the CI includes 1.0.  Id. at 581.  If a study found a risk ratio of 1.5 with a 95% CI of 1.1-2.2, the results are statistically significant because the CI does not include an RR of 1.0.  Id.[6]

2.   Bias

Bias is a systematic, non-random error.  Two types of relevant bias are selection bias (where the population of the study is not representative of the general population), and information bias (where inaccurate information about either the disease or the exposure status of the study participants is recorded).  Id. at 583.  Many studies have shown that individuals who participate in studies differ significantly from those who do not; thus, if a significant number of subjects drop out of a study before completion, the remaining subjects may not be representative of the original study population.  Id. at 584.  Research has also shown that individuals with diseases tend to recall past exposures more readily than individuals with no disease, which creates a potential for recall bias in studies that rely on retroactive interviews of subjects to determine exposure, such as retroactive case control studies.  Id. at 585.

---

[6] In this Opinion, risk ratios will be stated in the following format: 1.50 (0.95-1.80) or (1.50; 0.95-1.80), indicating a risk ratio of 1.50 with a 95% CI of 0.95-1.80.

### 3.   Confounding

Confounding, which occurs when another causal factor (the confounder) confuses the relationship between the agent of interest and outcome of interest, is another major cause for error in epidemiological studies.  <u>Id.</u> at 591.  For example, researchers may conduct a study that finds individuals with gray hair have a higher rate of death than those with hair of another color.  Instead of hair color having an impact on rate of death, the results are probably explained by the confounding factor of age.  <u>Id.</u>

Two major potential confounders are at issue in this litigation: confounding by indication and confounding by genetics.  Confounding by indication may be at issue if the reason a pregnant person takes acetaminophen itself causes ADHD. If, for example, fever during pregnancy is associated with development of ADHD, and fever is also related to whether a pregnant person takes acetaminophen, it will be critical to determine whether an association between prenatal exposure to acetaminophen and ADHD is causal or the result of confounding. As for genetic confounding, there could be genetic factors that make pregnant people more likely to take acetaminophen during pregnancy, and also make it more likely that their offspring will have ADHD.

Although there is always a chance that an unknown confounder contributes to a study's finding, there are choices researchers can make in designing a study that prevent, limit, or account for confounding.  For confounding by indication, a study design could track both the potential confounder (e.g., fever) and the exposure of interest (prenatal use of acetaminophen), and then control for fever in the data analysis.

Researchers can attempt to control for genetic confounders by gathering data on parental ADHD diagnoses, using negative control exposures, or conducting sibling control studies. Negative control exposures should be time-invariant and should not be expected to have a causal relationship to the outcome of interest.  For example, there is no reason to expect that paternal use of acetaminophen during pregnancy varies compared to paternal use of acetaminophen before pregnancy (time-invariance), or that it could cause a neurodevelopmental disorder in offspring (because conception has already occurred).[7]

In sibling control studies, researchers compare the rate of the outcome in siblings who were exposed to the agent to that of siblings who were not exposed.  If the association is causal,

---

[7] See, e.g., Sanderson et al., Negative Control Exposure Studies in the Presence of Measurement Error: Implications for Attempted Effect Estimate Calibration, 47(2) Int. J. Epidemiol. 587 (2018); Brew & Gong, Modelling Paternal Exposure as a Negative Control, 49(3) Int. J. Epidemiol. 1053 (2020).

the exposed sibling is expected to have a higher risk of the outcome than the non-exposed sibling.  Gustavson et al., Acetaminophen Use During Pregnancy and Offspring Attention Deficit Hyperactivity Disorder -- A Longitudinal Sibling Control Study, 1(2) JCPP Advances 1, 2 (2021) ("Gustavson 2021").  If the association is mainly explained by familial confounding factors, such as genetics or shared environmental factors, the risk should be similar for the two siblings.  Id.

B.  Causation

Once an association has been found between exposure to an agent and development of a disease, researchers then consider whether the association reflects a true cause-effect relationship.  It is important to note that epidemiology cannot prove causation; rather, causation is a judgment to be made by epidemiologists and others interpreting the epidemiological data.  RMSE at 598.  There is no objective formula or algorithm that can be used to determine whether a causal inference can be made.  Thus, although the drawing of causal inferences is informed by scientific expertise, courts must scrutinize proposed expert opinions on causation to ensure the experts conducted a review of available studies using a reliable methodology.  Id.  Pertinent to this MDL is whether it is reliable to draw a causal inference from the associations that

17

researchers have observed between prenatal acetaminophen exposure and ADHD.

IV. Types of Evidence at Issue Here

Since at least 1987,[8] scientists have been examining whether the prenatal use of acetaminophen may be associated with adverse neurodevelopmental outcomes.  To date, however, no medical organization or regulatory body has concluded that prenatal exposure to acetaminophen causes ADHD.  Before reviewing the relevant literature from medical organizations and regulatory bodies, some of the studies that have been undertaken are described.

A.   Published Studies

1.   Exposure Measurement Methods

Because acetaminophen is available without a prescription and used widely by both non-pregnant and pregnant individuals, it is particularly hard for researchers to come by objective and precise data about its use.  While a few studies have assessed acetaminophen exposure using biomarkers, which are objective measures, and one study used prescription data from maternal medical records, the majority of the studies have assessed

---

[8] Streissguth et al., Aspirin and acetaminophen use by pregnant women and subsequent child IQ and attention decrements, 35 Teratology 211 (1987).

18

# SPA-193

exposure using maternal self-reports at varying times during or after pregnancy.

For example, mothers in the Norwegian Mother and Child Cohort Study ("MoBa"), the data from which has been the basis of several studies, completed questionnaires at weeks 17 and 30 of gestation and 6 months after giving birth.  The mothers reported fever and medication use per month leading up to each questionnaire.  Mothers in the Danish National Birth Cohort ("DNBC"), another large cohort, were interviewed over the telephone at weeks 12 and 30 of gestation and 6 months after giving birth.  They were asked if they had ever taken painkillers during the preceding period; if they said yes, they were given a list of the 44 most common pain medications and were asked to report the number of weeks during which they had taken such medication in the preceding period.  One study used biennial questionnaires (Nurses Health Study II) and inferred exposure from use reported the year of the pregnancy; another used interviews ranging from a few days to up to 10 years after birth.  Some studies asked mothers to remember how many days they had used acetaminophen in a given period, others asked simply whether the mother had ever used acetaminophen during the pregnancy, and others asked for weeks of use without discriminating between, e.g., daily use during that week or use

# SPA-194

just once.  The studies discussed below should thus be interpreted with this heterogeneity in mind.

> 2.   Individual Studies

Dr. Ness relies principally on eight studies.  Six of those studies are original studies that examined data from five cohorts and the connection between prenatal acetaminophen exposure and an ADHD diagnosis.  Two of those studies are original studies that examine data from one cohort and the connection between perinatal or postnatal acetaminophen exposure and an ADHD diagnosis.

The designs of these studies reflect the challenges scientists have encountered in assessing whether an important and widely used over-the-counter drug has caused ADHD, a condition known to be highly heritable.  Some studies have used biomarkers instead of relying on maternal recall.  Some have controlled for indications of use during pregnancy, such as fever or pain.  Others have attempted to adjust for genetic confounding.

A very recent study, Ahlqvist 2024,[9] examined the issue of genetic confounding and is also discussed here even though it

---

[9] Ahlqvist et al., Acetaminophen Use During Pregnancy and Children's Risk of Autism, ADHD, and Intellectual Disability, 331(14) JAMA 1205 (2024).

was published after Dr. Ness delivered her expert report in this litigation.[10]  Its results "indicate that the association between acetaminophen use during pregnancy and neurodevelopmental disorders is a noncausal association."  Id. at 1212.

The oldest study on which Dr. Ness principally relies is Liew 2014.[11]  Liew 2014 drew data from the DNBC, which assessed exposure to acetaminophen using maternal interviews at weeks 12 and 30 of gestation.  This study had a sample size of 64,322 children.  The authors found statistically significant associations between a diagnosis of hyperkinetic disorder ("HKD")[12] and first trimester use (1.35; 1.07-1.72), use in both the first and third trimesters (1.41; 1.08-1.84), and use in all three trimesters (1.61; 1.30-2.01), id. at 318, but no such associations for second or third trimester use, for use in both the first and second trimesters, or for use in both the second and third trimesters.  Id.  The authors cautioned that "the possibility of unmeasured residual confounding by indication for

---

[10] Ahlqvist 2024 was published the day of Dr. Ness's deposition.

[11] Liew et al., Acetaminophen Use During Pregnancy, Behavioral Problems, and Hyperkinetic Disorders, 168(4) JAMA Pediatrics 313 (2014).

[12] HKD is the analogue for ADHD used by the International Statistical Classification of Diseases and Related Health Problems, 10th Revision ("ICD-10"), a medical classification list published by the World Health Organization.

drug use, ADHD-related genetic factors, or co-exposures to other medications cannot be dismissed." Id. at 319.

Liew 2019[13] gathered data from 8,856 children born to women enrolled in the Nurses' Health Study II cohort.  Data was collected in biennial questionnaires that asked women whether they had regularly used a variety of medications in the past two years.[14]  Regular maternal use during the year of the child's birth was analyzed as the exposure variable.  The authors also attempted to perform a negative control exposure analysis using the mother's responses from four years before and four years after the child's birth.  They found that ADHD was associated with regular use during the child's birth year (1.35; 1.07-1.71), but not with use four years before (1.12; 0.91-1.38) or after (1.05; 0.88-1.26).  Id. at 773.  In the subset of women

---

[13] Liew et al., Use of Negative Control Exposure Analysis to Evaluate Confounding: An Example of Acetaminophen Exposure and Attention-Deficit/Hyperactivity Disorder in Nurses' Health Study II, 188(4) Am. J. Epidemiol. 768 (2019).

[14] In 1993, women were asked to "mark if used regularly" the box next to acetaminophen if they used it 2+ times per week in a section titled "Current Medication".  In 1995, the questionnaires asked recipients how many days each month, on average, they took acetaminophen, with 0, 1-4, 5-14, 15-21, and 22+ days as options.  The 1996 study instructed women to "mark if used regularly in past 2 years" acetaminophen if use was 2+ times per week.  In 2001, they were directed to "mark if used regularly in past 2 years" both days per week (1, 2-3, 4-5, 6+) and total tabs per week (1-2, 3-5, 6-14, 15+).  See https://nurseshealthstudy.org/participants/questionnaires.

who indicated they were pregnant at the time they completed the questionnaire, there was a statistically insignificant association (1.39; 0.99-1.95), although in the model with acetaminophen use in all exposure periods included together, the association was statistically significant (1.46; 1.01-2.09). Id. The authors concluded that their results provided evidence that the association is "unlikely to be explained by [] time-invariant factors" such as genetics. Id. at 774.

Baker 2020,[15] a study of 345 children, is the only study that showed an association between an objective biological measure of prenatal exposure and a child's ADHD diagnosis. The authors found that detection of acetaminophen in meconium -- an infant's first feces, which may reflect exposure during the final two-thirds of pregnancy -- was associated with ADHD (2.43; 1.41-4.21). Id. at 1077. The authors conducted a sensitivity analysis to determine whether the results would be different if they excluded mothers who were given acetaminophen during delivery, and the association persisted (2.38; 1.35-4.21). Id. Self-reported maternal ADHD data was available for 155 individuals. Id. at 1075. The authors stated that controlling

---

[15] Baker et al., Association of Prenatal Acetaminophen Exposure Measured in Meconium with Risk of Attention-Deficit/Hyperactivity Disorder Mediated by Frontoparietal Network Brain Connectivity, 174(11) JAMA Pediatrics 1073 (2020).

for maternal ADHD in this subset increased the risk ratio by .02; however, that data is not presented in the main report or supplemental tables and the authors do not indicate whether the resulting risk ratio was statistically significant.  Id.  The authors did not control for indication for use.  The authors concluded that the association between prenatal acetaminophen and ADHD may be even stronger than previously estimated because prior studies may have been biased toward the null by inaccurate maternal recall, and that the FDA and the Society for Maternal Fetal Medicine ("SMFM") should "consider re-evaluating the evidence regarding the safety of fetal acetaminophen exposure." Id. at 1080.

Two studies, Ji 2018[16] and Ji 2020,[17] used objective measures of biomarkers to assess acetaminophen exposure during the postpartum (Ji 2018) and peripartum (Ji 2020) periods.  Both studies used data from the Boston Birth Cohort, which consists of a predominantly urban low-income minority population.  Ji 2018 measured acetaminophen and its metabolites in maternal

---

[16] Ji et al., Maternal Biomarkers of Acetaminophen Use and Offspring Attention Deficit Hyperactivity Disorder, 8(127) Brain Sci. 1 (2018).

[17] Ji et al., Association of Cord Plasma Biomarkers of In Utero Acetaminophen Exposure With Risk of Attention-Deficit/Hyperactivity Disorder & Autism Spectrum Disorder in Childhood, 77(2) JAMA Psychiatry 180 (2020).

24

# SPA-199

blood plasma from 1,180 samples taken 1-3 days postpartum. Looking at the total acetaminophen burden, the authors found associations of 1.58 (1.02-2.46) for below median and 1.88 (1.18-3.00) for above median compared to "not detected." Id. at 8. The authors controlled for maternal fever during pregnancy and intrauterine infection, but were unable to adjust for several familial factors. Id. at 11. Because the blood samples were taken post-partum and the half-life of acetaminophen is only 1.5-3 hours, the samples do not reflect prenatal use of acetaminophen.

Ji 2020 measured acetaminophen metabolites in umbilical cord plasma in 996 mother/child pairs. The authors found unchanged acetaminophen in 100% of the cord blood samples. They thus broke down the samples into thirds ("tertiles") based on the total level of acetaminophen detected (including unchanged acetaminophen and its metabolites). They found statistically significant increases in ADHD for both the second tertile compared to the first (2.26; 1.40-3.69) and the third tertile compared to the first (2.86; 1.77-4.67). As with Ji 2018, the authors adjusted for maternal fever but did not adjust for genetic factors. Id. at 188. Again, because of the short half-life of acetaminophen, the samples only reflected use during the period shortly before, during, and immediately after giving

birth, rather than the prenatal period.  The relevance of the Ji studies to this litigation is disputed by the parties.

Chen 2019,[18] a case-control study with 950 mother-and-child case pairs and 3,800 control pairs, analyzed data from medical records and found an association between prenatal acetaminophen prescriptions in Taiwan and a child's ADHD diagnosis.  After controlling for maternal infections during the pregnancy and maternal mental health disorders, such as major depressive disorder and bipolar disorder, Chen 2019 found an association between use in "any" trimester and an ADHD diagnosis (1.20; 1.01-1.42).[19]  Id. at e5.  Chen 2019 also found significant associations between ADHD risk and maternal mental health disorders, such as major depressive disorder (1.57; 1.10-2.24) and bipolar disorder (2.25; 1.19-4.27).  Id.  Its authors noted several limitations in the study, including that unreported ADHD may exist in the control group and the fact that none of the mothers in either the study pairs or control group had been

---

[18] Chen et al., Prenatal Exposure to Acetaminophen and the Risk of Attention-Deficit/Hyperactivity Disorder: A Nationwide Study in Taiwan, 80(5) J. Clin. Psychiatry (2019).

[19] The associations for the second trimester and for the first and second trimesters combined had a 95% CI that included 1.00. The associations for the first trimester, the third trimester, and for the third trimester combined with the first or second trimester had a 95% CI that spanned above and below 1.00.

identified with either ADHD or a substance use disorder.  Id. at e6.

Two studies -- Ystrom 2017[20] and Gustavson 2021 -- used data from the MoBa cohort.  The authors of Ystrom 2017 attempted to control for confounding due to indications for use of acetaminophen and parental symptoms of ADHD.  In the partially adjusted model, Ystrom 2017 found associations between use for greater than 29 days (2.20; 1.50-3.24) and an HKD diagnosis. Id. at 6.  In fully adjusted models, the study found associations between ever use (that is, any use during pregnancy) (1.12; 1.02-1.24), use in both first and second trimesters (1.21; 1.06-1.39) and in any two trimesters (1.22; 1.07-1.38) and an ADHD diagnosis.  Id. at 5.  The study also found that paternal preconceptional use of acetaminophen for 29 days or more was also associated with ADHD (2.06; 1.36-3.13). Id. at 4.  Given that paternal use of acetaminophen is also associated with ADHD, the authors reported that "the causal role of acetaminophen in the etiology of ADHD can be questioned." Id. at 7.  The authors cautioned that they "d[id] not provide definitive evidence for or against a causal relation between maternal use of acetaminophen and ADHD."  Id.

---

[20] Ystrom et al., Prenatal Exposure to Acetaminophen and Risk of ADHD, 140(5) Pediatrics 1 (2017).

Gustavson 2021 used more recent data from the same cohort to conduct a sibling-control analysis with the goal of assessing the role of familial confounding.  The authors found no association between use for less than 29 days and HKD but did initially find an association between HKD and use for more than 29 days over the course of the pregnancy (2.02; 1.17-3.25).  Id. at 7.  That association was attenuated to non-significance using a sibling-control analysis (1.06; 0.51-2.05).  Id.  The authors concluded that the association between acetaminophen use and ADHD "may at least partly be due to familial confounding."  Id. at 8.

Finally, Ahlqvist 2024 collected data from all singleton liveborn children in Sweden from July 1, 1995 to December 31, 2019, with follow-up until December 31, 2021, with a sample size of 2,480,797 children born to 1,387,240 mothers.  The authors measured exposure based on antenatal records collected at around 8-10 weeks gestation and later in pregnancy.  They found a slightly elevated risk of ADHD for ever-use of acetaminophen compared to never-use in the full population (1.07; 1.05-1.10).  Id. at 1205.  As in Gustavson 2021, however, when the authors performed a sibling analysis (N=1,773,747 full siblings), the association attenuated to non-significance (0.98; 0.94-1.02).  Id.  The authors performed statistical analyses to determine the

possible impact of exposure measurement error on their results
and found that "complete nullification of the acetaminophen-
neurodevelopment disorder associations going from the
population-based to sibling control models is unlikely to result
from even extreme levels of measurement error."  Id. at
eAppendix 2.  The authors noted that "[b]irthing parents with
higher acetaminophen use differed in many aspects from those
with lower use or no use."  Id. at 1212.  They concluded that
the results of their study "indicate that the association
between acetaminophen use during pregnancy and
neurodevelopmental disorders is a noncausal association."  Id.
While the study did not identify specific confounding factors,
it mentioned as likely candidates the pregnant individuals'
genetics and indications for use of acetaminophen such as
infection or fever.  Id.

     3.  Questionnaire Studies

     Several studies, on which Dr. Ness relies "for context,"
used the results of screening questionnaires as outcome
measurements as opposed to a diagnosis of ADHD.  These screening
questionnaires included, inter alia, the Strength and
Difficulties Questionnaire ("SDQ"), the Ages and Stages
Questionnaire ("ASQ"), the Child Behavior Checklist ("CBCL"),
the Childhood Autism Spectrum Test ("CAST"), and the

**SPA-204**

Emotionality, Activity, and Sociability Temperament Questionnaire ("EAS"). As noted in the First Daubert Opinion, it is challenging to assess consistency and make comparisons among studies that rely on questionnaires that have multiple endpoints and contain no diagnosis of ADHD. First Daubert Opinion, 2023 WL 8711617, at *25. There is an increased risk that an investigator or expert will cherry pick results or fail to address inconsistencies. Id. Dr. Ness relied on non-diagnostic studies to a lesser extent than the plaintiffs' first set of experts.

     4. Meta-Analyses

Finally, there have been several meta-analyses attempting to pool data from existing studies on the association between acetaminophen and ADHD. The most recent meta-analysis, Ricci 2023, is the only meta-analysis that conducted a subgroup analysis limited to studies with diagnostic outcome measurements. Ricci 2023 conducted an ADHD subgroup analysis using data from Baker 2020, Ji 2020, Liew 2019, and Ystrom 2017. The authors concluded that their analysis suggests "a small increase in risk of child ADHD associated with in utero acetaminophen exposure," but noted that "[t]he certainty of the evidence on this topic is low," and their findings "should be further explored in future high-quality research on a range of

neurodevelopmental outcomes, with adequate control for confounding by indication."  Id. at 483.

  **B.** **Statements by Governmental Bodies, Medical Societies, and other Associations**

    **1.** **FDA Oversight**

  Following the publication of Liew 2014, the FDA opened a Tracked Safety Issue ("TSI") for prenatal acetaminophen exposure on May 15, 2014; it has been conducting periodic reviews of the evidence ever since.  The 2014 review recommended that "no regulatory action be taken at this time based on available data" but that, given the TSI, "DEPI [the Division of Epidemiology] and DNDP [the Division of Nonprescription Drug Products] stay current on the published safety literature related to [acetaminophen] use in pregnancy." FDA 2014 at 3.  The 2015 review concluded that "[w]hether the association [between prenatal exposure to APAP and behavioral difficulties] is causal in nature remains uncertain." FDA 2015 at 8.  In 2016, the FDA noted that "in utero exposure to APAP was associated with a spectrum of adverse neurodevelopmental outcomes, though findings with respect to specific outcomes varied somewhat across studies, and positive findings were generally modest." FDA 2016 at 15.  It further stated that "a causal relationship [between prenatal exposure to APAP and adverse neurodevelopmental outcomes] is not certain because of the possibility of

confounding, particularly by conditions such as maternal fever and infection that may prompt pregnant women to take APAP but which may also be risk factors for neurocognitive problems."
Id.

In 2015, the FDA issued a public Drug Safety Communication about prenatal use of NSAIDs, opioids, and acetaminophen.  See FDA, FDA has reviewed possible risks of pain medicine use during pregnancy (Jan. 9, 2015), at perma.cc/4JY6-CN6V.  The safety announcement noted the recent reports questioning the safety of pain medications when used during pregnancy, but stated that the FDA had evaluated the scientific literature and determined it was too limited to make any recommendations.  Id. at 1.  Regarding ADHD specifically, the announcement noted that the "weight of evidence is inconclusive regarding a possible connection between acetaminophen use in pregnancy and ADHD in children."  Id. at 5.

In 2016, the FDA reviewed published preclinical literature (i.e., animal studies).  It concluded that the animal studies were not adequately designed to address the question of causation, and that behavioral responses in animals predictive of ADHD in humans are uncertain.  FDA 2017 at 2.

A 2017 review noted that all of the observational studies reviewed "had significant limitations that question the causal

32

effect of [acetaminophen] on adverse neurodevelopmental outcomes." FDA 2017 at 10.  Thus, the FDA was "unable to draw any conclusion about the causal association between prenatal [acetaminophen] exposure and the different adverse neurodevelopmental outcomes, based on the available evidence." Id. at 12.  That review recommended informing the public that the FDA had evaluated additional studies but retaining the 2015 conclusion about the inability to draw causality conclusions. Id.

        The FDA conducted further reviews in 2022 and 2023.  The 2022 review looked at 24 additional studies.  FDA 2022 at 7.  It concluded that "there are still study limitations and inconsistent study findings that prohibit causal interpretations of the association between APAP exposure and functional neurobehavioral outcomes."  Id. at 33.  The 2023 review looked at three additional studies, only one of which assessed attention, and concluded that "findings on the associations between APAP use during pregnancy and neurobehavioral . . . outcomes remain mixed."  FDA 2023 at 17.  It noted that the three studies reviewed "do not change DEPI-I's conclusions from its most recent review -- the limitations and inconsistent findings of current observational studies of APAP and

neurobehavioral and urogenital outcomes are unable to support a determination of causality." Id. at 17-18.

    2.  Other Organizations

The FDA's conclusions are in line with the conclusions reached by medical societies both in this country and in Europe. For example, the U.S.-based SMFM examined studies on acetaminophen and neurodevelopmental outcomes in 2017.  SMFM found that "the weight of the evidence is inconclusive regarding the possible causal relationship between acetaminophen use and neurobehavioral disorders in the [children]" and that acetaminophen use during pregnancy is "reasonable and appropriate."[21]  The Royal College of Obstetricians and Gynaecologists, a professional association based in the United Kingdom, noted in 2018 that "[c]urrent advice is that [acetaminophen] remains safe for use during pregnancy and breastfeeding."  Bisson, Antenatal and postnatal analgesia: Scientific Impact Paper No. 59, BJOG (2018), at e117-118.

The first major statement suggesting that pregnant women receive a more specific warning about the risk of developmental disorders in their offspring came just three years ago.  In 2021, a group of 13 authors (joined by 78 signees) -- consisting

--------

[21] SMFM, SMFM Statement: Prenatal Acetaminophen Use and Outcomes in Children, 216(3) Am. J. Obstetrics & Gynecology B14, B15 (2017).

of scientists, clinicians, and epidemiologists -- published a
"Consensus Statement" reviewing literature concerning prenatal
acetaminophen use and adverse developmental outcomes, including
ADHD.  Bauer et al., Consensus Statement: Paracetamol Use During
Pregnancy — A Call for Precautionary Action, 17 Nature Revs.
Endocrinology 757, 758, 762 (2021) ("Consensus Statement").  The
Consensus Statement called for the prioritization of research
initiatives and evidence-based medical guidance for
acetaminophen use by pregnant women.  The authors of the
Consensus Statement stated that "the combined weight of animal
and human scientific evidence is strong enough for pregnant
women to be cautioned by health professionals against its
indiscriminate use . . . .  We recommend that APAP should be
used by pregnant women cautiously at the lowest effective does
for the shortest possible time."  Id. at 764.

The Consensus Statement prompted a "Consensus
Counterstatement" by another group of 60 scientists and
clinicians (comprising 10 authors and 50 signees) affiliated
with the Organization of Teratology Information Specialists
("OTIS").  See Alwan et al., Paracetamol Use In Pregnancy --
Caution Over Causal Inference From Available Data, 18 Nature
Revs. Endocrinology 190 (2022) ("Counterstatement").  The
authors of the Counterstatement reviewed literature and

concluded that the studies were "limited by serious methodological problems, including failure to account for confounding, and elements of bias that make interpretation of the data challenging." Id. Although the authors agreed with the Consensus Statement's call for further investigation, they "urge[d] against recommending [] precautionary measures for [acetaminophen] use in pregnancy and against the dissemination of information based on inconclusive and insufficient evidence." Id.

In a reply, the authors of the Consensus Statement pointed out that "we avoided any inference of causality in our Consensus Statement." Bauer et al., Reply to 'Paracetamol Use In Pregnancy -- Caution Over Causal Inference from Available Data'; 'Handle With Care -- Interpretation, Synthesis and Dissemination of Data on Paracetamol in Pregnancy', 18 Nature Rev. Endocrinology 192 (2022). They reiterated, however, their belief that "available data provide sufficient evidence for concern and a recommendation of precautionary action." They also noted that "[o]ur recommendations should not increase maternal anxiety, as they only suggest adherence to current guidelines." Id.

Another response to the initial Consensus Statement, signed by 63 researchers and clinicians and 16 organizations, "argue[d]

that the available evidence supports neither a change in clinical practice (minimal use when necessary), restricting APAP availabilities to pharmacies, nor additional warning labels on packaging." O'Sullivan 2022.[22]  The authors of the O'Sullivan 2022 statement noted that "[t]he overarching societal message that has been drawn from [the] Consensus Statement is that APAP use in pregnancy is unsafe and should be restricted in both use and access." Id.  The authors stated that "[w]e, and others, believe this interpretation is exaggerated." Id.  The organizations that signed this letter included the International Federation of Gynecology and Obstetrics, the European Association of Perinatal Medicine, the British Maternal and Fetal Medicine Society, the U.K. Teratology Information Service, as well as American, Angolan, Brazilian, Canadian, Finnish, and Portuguese obstetric and gynecological associations.

Medical bodies also responded to the Consensus Statement. The American College of Obstetricians and Gynecologists ("ACOG") reviewed the literature and noted that the studies "show no clear evidence that proves a direct relationship between the prudent use of acetaminophen during any trimester and fetal developmental issues." ACOG, ACOG Response to Consensus

---

[22] O'Sullivan et al., Paracetamol Use in Pregnancy -- Neglecting Context Promotes Misinterpretation, 18 Nat. Rev. Endocrinology 385 (2022).

Statement on Paracetamol Use During Pregnancy (Sept. 29, 2021).[23]
The European Network of Teratology Information Services
("ENTIS") issued a position statement that the Consensus
Statement "reflects the views of the authors and is not endorsed
by regulatory authorities or medical specialty organizations."
European Network of Teratology Information Services, Position
Statement on Acetaminophen (Paracetamol) in Pregnancy, at 1
(Oct. 3, 2021).  It noted several problems with the underlying
studies, including the use of unvalidated outcome measurements,
which "are neither developed nor validated for the purpose and
context in which they are used."  Id.  It specifically pointed
to Ji 2020, which it stated has "severe issues with external and
internal validity."  Id. at 2.  ENTIS noted that the Consensus
Statement "and the ensuing reaction w[ould] promote unwarranted
uncertainty, fear, and guilt among pregnant women" and would
"also likely result in use of less safe alternatives during
pregnancy."  Id.

    In November 2021, the Society of Obstetricians and
Gynaecologists of Canada ("SOGC") weighed in.  It noted that
"[t]he position of the SOGC, and a number of other international
societies, is that the evidence for causality for this claim is

---

[23] https://www.acog.org/news/news-articles/2021/09/response-to-
consensus-statement-on-paracetamol-use-during-pregnancy.

weak and has many fundamental flaws."  SOGC, Statement on the Use of Acetaminophen for Analgesia and Fever in Pregnancy (Nov. 8, 2021).[24]

Finally, after the publication of Ahlqvist 2024, which was funded in part by the National Institutes of Health ("NIH"), the NIH issued a news release regarding the study.[25]  The NIH stated that, according to the study, "[a]cetaminophen exposure during pregnancy is not linked to the risk of autism, ADHD, or intellectual disability."  Id.

## Discussion

As in all tort cases, plaintiffs in this MDL must prove by a preponderance of the evidence that defendants' breach of a duty owed to plaintiffs caused plaintiffs' injuries.  Causation in pharmaceutical products liability cases such as those in this litigation has two components, general and specific.  Daniels-Feasel v. Forest Pharmaceuticals, Inc., 2021 WL 4037820, at *5 (S.D.N.Y. 2021), aff'd, 2023 WL 4837521 (2d Cir. 2023) (citation omitted).  "General causation is whether a substance is capable of causing a particular injury or condition in the general

---

[24] https://sogc.org/en/en/content/featured-news/Statement_on_the_use_of_acetaminophen.aspx.

[25] https://www.nih.gov/news-events/news-releases/study-reveals-no-causal-link-between-neurodevelopmental-disorders-acetaminophen-exposure-before-birth.

# SPA-214

population, while specific causation is whether a substance caused a particular individual's injury." Id. (citation omitted).

As the above discussion reflects, the state of scientific evidence on prenatal use of acetaminophen presents a challenge for any expert witness offering the opinion that such use causes ADHD. Major medical organizations and regulators have cautioned against drawing causal inferences from the existing body of scientific literature. Nevertheless, Dr. Ness draws such an inference. Dr. Ness opines that within a reasonable degree of scientific certainty, prenatal use of acetaminophen causes ADHD. Defendants argue that Dr. Ness's opinions are inadmissible under the Federal Rules of Evidence and the standards set by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. Before addressing this motion, the relevant legal standards are set forth.

I.   Standard: Daubert and Rule 702

Federal Rule of Evidence 702 ("Rule 702") governs the admission of expert testimony in federal court. The Supreme Court has made clear that the district court has a "gatekeeping" function under Rule 702: it is charged with the "task of ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597.

Testimony is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>Bustamonte v. KIND, LLC</u>, 100 F.4th 419, 427 (2d Cir. 2024) (citation omitted). Next, to determine whether expert testimony has a sufficiently reliable foundation to be admissible at trial, a court must consider the "indicia of reliability identified in [Rule] 702." <u>Clerveaux v. East Ramapo Central School District</u>, 984 F.3d 213, 233 (2d Cir. 2021) (citation omitted).

Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify, "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[26]  An expert can fail to meet the Rule 702 and
Daubert standards "for various reasons, relating to the expert's
qualifications and/or methodology."  Mirena II, 341 F. Supp. 3d
at 240.

     1.  Qualification

    To determine whether a witness qualifies as an expert,
courts "compare the area in which the witness has superior
knowledge, education, experience, or skill with the subject
matter of the proffered testimony."  Id. (citing United States
v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004)).  In
determining whether the witness has the relevant experience,
courts consider "the degree to which that experience was
developed for litigation."  Id.; see also In re Mirena IUD
Products Liability Litigation, 169 F. Supp. 3d 396, 440
(S.D.N.Y. 2016), aff'd, 713 Fed. Appx. 11, 15 (2d Cir 2017)
("Mirena I") (affirming exclusion of experts who "lacked pre-

---

[26] Rule 702 was amended effective December 1, 2023.  "Nothing in
the amendment imposes any new, specific procedures."  Fed. R.
Evid. 702, Advisory Committee Notes, 2023 Amendments.  Instead,
one purpose of the amendment was to emphasize that
    [j]udicial gatekeeping is essential because just as
    jurors may be unable, due to lack of specialized
    knowledge, to evaluate meaningfully the reliability of
    scientific and other methods underlying expert
    opinion, jurors may also lack the specialized
    knowledge to determine whether the conclusions of an
    expert go beyond what the expert's basis and
    methodology may reliably support.
Id.

# SPA-217

litigation expertise" and "developed their theories for the purposes of this litigation").  If the witness does not possess superior knowledge, education, experience or skill in the relevant area, the court must exclude her testimony.  Mirena II, 341 F. Supp. 3d at 240-41.

2.   Reliability

In addition to the indicia of reliability identified in Rule 702, a trial court may consider the criteria enumerated in Daubert, "some or all of which might prove helpful in determining the reliability of a particular scientific theory or technique."  Clerveaux, 984 F.3d at 233 (citation omitted).  The Daubert factors are: (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate and the existence and maintenance of standards controlling the technique's operation; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community.  Daubert, 509 U.S. at 593-94.  "[W]hile a court need not consider the Daubert factors, it does not abuse its discretion in doing so."  Mirena II, 982 F.3d at 124.

Although "Rule 702 sets forth specific criteria for the district court's consideration, the Daubert inquiry is fluid and

# SPA-218

will necessarily vary from case to case." Id. at 123 (citation omitted). The Daubert factors do not constitute a definitive checklist or test. For example, courts also consider whether the proffered expert opinions were developed for the purpose of litigation. Daniels-Feasel, 2021 WL 4037820, at *4 (citation omitted). Further, proffered expert testimony can fail all four Daubert factors and still be admitted; however, in those circumstances, a court must "carefully scrutinize, pause, and take a hard look at the expert's methodology." Mirena II, 341 F. Supp. 3d at 240. So long as an expert's analysis is reliable "at every step," it is admissible. Mirena II, 982 F.3d at 123 (citation omitted). But "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible." Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) (citation omitted). Thus, it may not only be appropriate for a district court "to take a hard look at plaintiffs' experts' reports," it may be "required to do so to ensure reliability." Mirena II, 982 F.3d at 123. "[I]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Id.

(citation omitted).  Ultimately, a court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  <u>Kumho Tire Co.</u>, 526 U.S. at 152.

Although the Supreme Court in <u>Daubert</u> emphasized that the court's inquiry under Rule 702 must focus "solely on principles and methodology, not on the conclusions they generate," 509 U.S. at 595, it later clarified that "conclusions and methodology are not entirely distinct from one another."  <u>General Electric Company v. Joiner</u>, 522 U.S. 136, 146 (1997).  Thus, although

> [t]rained experts commonly extrapolate from existing data[,] nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

<u>Id.</u>

Where, however, an expert "otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support [for an expert's opinion] may go to the weight, not the admissibility of the expert's testimony."  <u>Mirena II</u>, 982 F.3d at 124.  A "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion <u>per se</u> inadmissible."  <u>Amorgianos</u>, 303 F.3d at

**SPA-220**

267.   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."   Daubert, 509 U.S. at 596.

II.   Epidemiology Cases

Several additional considerations are important when experts offer general causation opinions in pharmaceutical cases.   For instance, "if an expert applies certain techniques to a subset of the body of evidence and other techniques to another subset without explanation, this raises an inference of unreliable application of methodology."   In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation, 858 F.3d 787, 797 (3d Cir. 2017) ("Zoloft").   Additionally, when experts rely on the studies of others, they must not exceed the limitations the authors themselves place on the study.   Daniels-Feasel, 2021 WL 4037820, at *4.

Further, "an expert must not cherry-pick from the scientific landscape and present the Court with what he believes the final picture looks like."   Id. at *5 (citation omitted). Instead, "[s]ound scientific methodology in assessing general causation requires an expert to evaluate all of the scientific evidence when making causation determinations."   Id. (citation omitted).   Cherry-picking is a form of "result-driven analysis

46

# SPA-221

which undermines principles of the scientific method by applying methodologies (valid or otherwise) in an unreliable fashion." Id. (citing In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502, 892 F.3d 624, 634 (4th Cir. 2018)).  "Therefore, exclusion of the proffered testimony is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion."  Id.

Dr. Ness, like plaintiffs' prior experts, has employed a "Bradford Hill" analysis, which is a generally accepted methodology for determining causation among epidemiologists. See Zoloft, 858 F.3d at 795; see also RMSE at 599-606; Daniels-Feasel, 2021 WL 4037820, at *6-*7.  The Bradford Hill criteria are "metrics that epidemiologists use to distinguish a causal connection from a mere association."  Zoloft, 858 F.3d at 795.

The nine Bradford Hill criteria are:

1) Strength of Association.  This criterion is represented by the risk ratio discussed above.  The higher the relative risk, the higher the likelihood that the relationship is causal.  Lower relative risks can also reflect causality, but such associations should be scrutinized more carefully because there is a greater chance that they are the result of uncontrolled confounding or biases.  RMSE at 602.

47

2) <u>Consistency</u>.  Because no single study can prove causation, it is important to replicate study results before drawing an inference of causation.  Consistent findings observed in multiple studies across different populations tend to support causation.  <u>Id.</u> at 604.

3) <u>Dose-Response</u>.  A dose-response relationship exists where studies show that the greater the exposure, the greater the risk of disease.  <u>Id.</u> at 603.  Generally, higher exposures should increase the incidence or severity of disease; however, some causal agents do not exhibit a dose-response relationship.  <u>Id.</u>  For example, some agents do not cause disease until the exposure exceeds a certain threshold dose.  <u>Id.</u>  Thus, a dose-response relationship is strong but not essential evidence of causation.

4) <u>Biological Plausibility</u>.  Causal relationships should be consistent with existing knowledge about the mechanism by which the outcome develops.  The importance of this factor depends on the degree of existing knowledge about how a disease develops.

5) <u>Temporality</u>.  Causes must precede effects.

6) <u>Coherence</u>.  A causal relationship should be consistent with other information and knowledge about the disease or harm.

**SPA-223**

7) <u>Specificity</u>.  When the exposure is only associated with a single disease or type of disease, such specificity strengthens the case for a causal inference.  Lack of specificity does not undermine causal inferences where there is a good explanation for its absence.  <u>Id.</u> at 605-606.

8) <u>Analogy</u>.  A causal inference is supported where relationships similar to the putative causal relationships have been substantiated.

9) <u>Experimental Evidence</u>.  Causation is more likely if there is experimental evidence showing that removing the exposure results in a decrease of the occurrence of a disease.

The Bradford Hill analysis has been found to be a "generally reliable" methodology.  <u>Zoloft</u>, 858 F.3d at 796.  No single Bradford Hill factor is required to infer causation; the criteria "are neither an exhaustive nor a necessary list."  <u>Id.</u>

Rule 702 requires, however, that an expert not only use "reliable principles and methods" but also that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.  "Flexible methodologies . . . can be implemented in multiple ways; despite the fact that the methodology is generally reliable, each application is distinct and should be analyzed

49

for reliability." <u>Zoloft</u>, 858 F.3d at 795.  Experts must "rigorously explain how they have weighted the criteria considered." <u>Daniels-Feasel</u>, 2021 WL 4037820, at *6.

Because the Bradford Hill factors are "neither an exhaustive nor a necessary list[,] [a]n expert can theoretically assign the most weight to only a few factors, or draw conclusions about one factor based on a particular combination of evidence." <u>Zoloft</u>, 858 F.3d at 796.  "No algorithm exists for applying the [Bradford] Hill guidelines to determine whether an association truly reflects a causal relationship or is spurious." <u>Milward v. Acuity Specialty Prods. Grp., Inc.</u>, 639 F.3d 11, 18 (1st Cir. 2011) (citation omitted).  Thus, district courts must ensure that "[t]he specific way an expert conducts such an analysis [is] reliable." <u>Zoloft</u>, 858 F.3d at 796.  "In discussing the conclusions produced by such techniques in light of the Bradford Hill criteria, an expert must explain 1) how conclusions are drawn for each Bradford Hill criterion and 2) how the criteria are weighed relative to one another." <u>Id</u>.

III. Dr. Ness

Dr. Roberta Ness, M.D., M.P.H., has provided an expert report dated February 7, 2024.[27]  Dr. Ness is an esteemed epidemiologist.  She was the Rockwell Endowed Professor in

---

[27] Dr. Ness has not practiced medicine for over 25 years.

Public Health at the University of Texas at Houston, having retired in 2020.  From 2008 to 2014, she was the Dean of the University of Texas School of Public Health.  She holds an M.D. from Cornell University and an M.P.H. in epidemiology from Columbia University.  She has received several honors throughout her career, including, in 2017, the Lilienfeld Award for extraordinary contributions to the field of epidemiology from the American College of Epidemiology.  She served as the President of the American College of Epidemiology in 2008 and the President of the American Epidemiologic Society in 2012. She was also elected to the National Academy of Medicine in 2009.

Dr. Ness's areas of expertise are women's health and epidemiology; in particular, her research has focused on ovarian cancer, pelvic inflammatory disorder, and preeclampsia.  She has published approximately 450 peer reviewed publications on topics such as risk factors for ovarian cancer, pregnancy complications, and gynecologic and sexually transmitted infections.  Dr. Ness has served as an expert witness in several lawsuits in which plaintiffs alleged that their use of talcum powder caused them to develop ovarian cancer.

Dr. Ness has limited professional experience with psychiatry, toxicology, and neurology.  She has not published

articles or conducted research in these areas.  Her curriculum
vitae does not list any publication related to the development
of neurological disorders in utero.  In the late 1990s and early
2000s, however, she served as a co-investigator in research on
lead exposure, attention deficit disorder, and delinquency; in
2002, she co-authored an article examining associations between
bone lead levels and behavioral issues in adjudicated delinquent
youths.[28]  Other than the bone lead article, she has not
published articles on ADHD.  She has not conducted research
looking at in utero exposure to acetaminophen and
neurodevelopmental disorders.

Dr. Ness's engagement with these issues began in August
2022, when she was retained by an attorney from one of the law
firms serving as lead counsel in this litigation.  At the
attorney's request, Dr. Ness agreed to look at the literature on
acetaminophen.  She had not heard of a relationship between
acetaminophen and ADHD prior to her work as a consultant in this
case.  After reviewing the literature presented to her by
plaintiffs' counsel, she spoke to a news publication on the link
between prenatal exposure to acetaminophen and both autism and

---

[28] Needleman et al., Bone Lead Levels in Adjudicated Delinquents:
a Case-Control Study, 24 Neurotoxicol. Teratol. 711 (2002).

**SPA-227**

ADHD and reviewed the content of the Autism Justice website, a website used to "acquire" plaintiffs.

After the First Daubert Opinion was issued, Dr. Ness was asked by plaintiffs' counsel to assess "the degree to which the epidemiologic and other supporting literature supports a case for general causality between prenatal use of acetaminophen (APAP) and attention deficit hyperactivity disorder."[29]  She offers the opinion that "within a reasonable degree of scientific certainty, prenatal use of APAP causes ADHD."  Dr. Ness conducted "an analytical review and evaluation of the published literature," which, "along with [her] education, training and experience provide the basis for [her] opinion."  Dr. Ness's report is silent as to how she identified the studies to which she applied her Bradford Hill analysis.  She concludes that consistency, dose-response, temporality, analogy, biologic plausibility, and coherence are met.  She concludes that strength of association is partially met and that specificity and experiment are not satisfied.  Her report is strikingly similar to that of Dr. Andrea Baccarelli, whose testimony was ruled inadmissible in the First Daubert Opinion, 2023 WL

---

[29] In her capacity as a consulting expert, Dr. Ness initially assessed the literature provided to her by plaintiffs' counsel involving ASD as well as ADHD.  After the First Daubert Opinion was issued, plaintiffs' counsel asked her to address only ADHD.

# SPA-228

8711617, at *20, although it also contains passages responsive to that Opinion.

Defendants argue that Dr. Ness's opinions on strength, consistency, specificity, dose-response and analogy are unreliable for several reasons. Defendants further argue that Dr. Ness is not qualified to offer opinions about biological mechanism or temporality and that, in any case, her opinions on those two factors are speculative and unreliable. After her qualifications are addressed, her Bradford Hill analysis will be discussed.

A.   Qualifications

Defendants argue that Dr. Ness is not qualified to opine on biological plausibility and temporality because she has no specific expertise in toxicology, teratology,[30] pharmacology, or psychiatry. This argument has force.

The plaintiffs originally offered Dr. Robert Cabrera, an expert in teratology, to offer theories of biological plausibility. First Daubert Opinion, 2023 WL 8711617, at *37-40. He principally relied on a theory of oxidative stress. Id. at *38. The First Daubert Opinion struck Dr. Cabrera's opinion regarding oxidative stress for several reasons, including its

---

[30] Teratology is the study of abnormalities, malformations and developmental disabilities that occur during prenatal development.

failure to address two critical gaps in its analysis of the
adverse outcome pathway and its cherry-picking of isolated
findings.  Id. at *39-40.  The plaintiffs also relied on several
experts with distinguished careers in the field of psychology
and the treatment of NDDs.  They included Dr. Andrea Baccarelli,
who had co-authored studies on the impact of the use of
acetaminophen during pregnancy on children's neurodevelopment,
id. at *19, and Dr. Eric Hollander, a neuro-pharmacologist and
psychiatrist who had published a book on ASD, id. at *40.

    In contrast to the plaintiffs' five experts whose testimony
was the subject of the First Daubert Opinion, Dr. Ness has
little relevant expertise other than her substantial credentials
as an epidemiologist.  Dr. Ness's lack of expertise in the
fields most pertinent to this litigation is concerning.  Her
lack of familiarity with ADHD was apparent at her deposition.
Dr. Ness was frequently unable to answer even basic questions
about ADHD -- such as examples of screening tools for ADHD --
without reading directly from her report.  Nor could she answer
questions of when ADHD develops in the fetal brain without
reading from her report, or provide even a "high-level overview"
of her proposed biological mechanism for its development.

    Her lack of familiarity with the pertinent literature was
also evident.  For instance, her report states, regarding Baker

2020, that "[t]he use of MRI scanning validated the ADHD diagnosis." When questioned about the study, Dr. Ness was not able to answer without reading directly from her report or the study itself. As she ultimately conceded at her deposition, among the 48 children included in the study's MRI analysis, the authors did not measure ADHD directly. Baker 2020 at 1079. Importantly, MRI imaging is not a validation tool for ADHD. See DSM at 72 (noting that currently, "no form of neuroimaging can be used for diagnosis of ADHD"); see also Faraone 2021[31] at 792 (noting that although neuroimaging studies find small differences in the structure and functioning of the brain between people with and without ADHD, these differences cannot be used to diagnose ADHD).

Dr. Ness's lack of relevant pre-litigation expertise is particularly evident in the two areas identified by the defendants: the proposal of a biological mechanism by which prenatal exposure to acetaminophen may cause ADHD and the demonstration of temporality, that is, that cause precede effect. Her lack of expertise meant that she struggled to answer during her deposition even basic questions regarding these components of her report. Although Dr. Ness's proposed

---

[31] Faraone et al., The World Federation of ADHD International Consensus Statement: 208 Evidence-based Conclusions about the Disorder, 128 Neuro. Biobehavioral Rev. 789 (2021).

# SPA-231

testimony will not be excluded on the basis that she is unqualified to offer it, the fact that her opinion was developed for litigation requires a court to undertake a particularly careful examination of the opinion to ensure its reliability.

B.   Reliability

Defendants argue that Dr. Ness's analysis of causation is unreliable.  They are correct.  Before addressing the deficiencies in Dr. Ness's Bradford Hill analysis, however, her failure to treat the evidence of genetic confounding adequately will be described.

1.   Genetic Confounding

Dr. Ness recognizes that genetic confounding is "very concerning" and requires her careful analysis.  She acknowledges that genetics "could be a true confounder."  She concludes, however, that genetic confounding "may partially inflate" the observed risk between maternal acetaminophen use and the risk of ADHD in offspring, but finds "no compelling" data to support the idea that genetics "could eliminate the association."  In reaching this conclusion she identifies three studies that, in her view, are worth taking seriously: Ystrom 2017, Leppert 2019,[32] and Gustavson 2021.  Then, based on the maternal negative

---

[32] Leppert et al., Association of Maternal Neurodevelopmental Risk Alleles With Early-Life Expsoures, 76(8) JAMA Psychiatry 834 (2019).

**SPA-232**

control results from <u>Ystrom 2017</u> and <u>Liew 2019</u>,[33] she concludes that confounding by genetics is not "the most likely" explanation for any apparent association between acetaminophen exposure and ADHD.

Dr. Ness's approach to this issue does not reflect the rigor required to render an admissible opinion on causation. The defendants point out not only the defects in her analysis of <u>Ystrom 2017</u>, <u>Leppert 2019</u>, and <u>Gustavson 2021</u>, but also the plaintiffs' failure to grapple with <u>Ahlqvist 2024</u> and its impact on Dr. Ness's evaluation of genetic confounding.  Because genetic confounding must be seriously considered when examining any association between prenatal exposure to acetaminophen and the diagnosis of ADHD in offspring, these deficiencies, by themselves, render the entire causation analysis advanced by Dr. Ness inadmissible.

As for the first study she highlights, <u>Ystrom 2017</u>, Dr. Ness does not seriously engage with its findings.  <u>Ystrom 2017</u> found that a father's preconceptual use of acetaminophen was as strongly associated with a child's diagnosis of ADHD as a mother's use in all three trimesters and in any two trimesters

---

[33] <u>Ystrom 2017</u> used maternal prepregnancy use of acetaminophen as a maternal negative control, and found that it had no effect on offspring ADHD.  <u>Id.</u> at 4.  <u>Liew 2019</u> found non-significant associations between maternal prepregnancy and post-pregnancy use and offspring ADHD.  <u>Id.</u> at 773.

during the pregnancy.  Id. at 5.  Dr. Ness describes the finding as "unexpected" and "odd," and rejects it as irrelevant because it is not measuring the impact of the mother's contribution to her offspring's diagnosis.  That misses the point.  As the authors of Ystrom 2017 acknowledge, the association of paternal use with a diagnosis of ADHD in offspring is not definitive evidence of a causal relationship but it does raise a question of whether a causal relation between maternal use of acetaminophen and ADHD exists.  At the very least, as the July 2022 Review by the FDA noted, the paternal result in Ystrom 2017 suggests unmeasured confounding.  FDA 2022 at 26.

Dr. Ness's treatment of Leppert 2019 is also problematic.  Leppert 2019 found an association between maternal polygenic risk score for ADHD and a mother's prenatal use of acetaminophen during both early and late pregnancy.  Id. at 838.  The results of the study indicated to the authors that "mothers with higher ADHD [polygenic risk scores] may also be more likely to use acetaminophen during pregnancy."  Id. at 839.  The authors observed that genetic confounding must be accounted for when studying any observed association between ADHD in offspring and the use of acetaminophen during the pregnancy.  Id. at 840.  Dr. Ness dismisses this study because the authors "did not show directly that genetic risk impacted the association between APAP

use and ADHD." Dr. Ness points to Stergiakouli 2016 and Ruisch 2018 as mitigating concerns over genetic confounding and elevates the results of those studies over Leppert 2019. Dr. Ness states that "Stergiakouli and Ruisch both actually applied the genetic risk score to the assessed link between APAP use and ADHD and found no substantial diminution of effect." This is not entirely correct. While Stergiakouli 2016 found that maternal polygenic risk score for ADHD was not associated with acetaminophen use during pregnancy (that is, did not find the link that Leppert 2019 found three years later), Ruisch 2018 controlled only for conduct disorder ("CD") polygenic risk scores, not ADHD polygenic risk scores.

But it is Dr. Ness's treatment of Gustavson 2021 that is most troubling. To recap, Gustavson 2021 used data from the MoBa cohort to conduct a sibling-control analysis with the goal of assessing the role of familial confounding. The study was based on over 21,000 children, comprised of over 10,000 sibling pairs,[34] and found that the association between HKD and use of acetaminophen for more than 29 days was attenuated to non-significance using a sibling control analysis (1.06; 0.51-2.05).

---

[34] Of the 21,448 children, over 19,000 belonged to a sibling pair, almost 2,000 belonged to a trio, and 80 children belonged to a quartet. Gustavson 2021 at 3.

# SPA-235

Siblings were discordant on exposure to acetaminophen and an ADHD diagnosis in 306 families, and were discordant on long-term exposure (more than 29 days) and ADHD diagnosis in 34 families (comprising 72 children).

Dr. Ness acknowledges that the sibling control results in Gustavson 2021 are a "cause for concern" but dismisses the study as having serious limitations, most notably its small size.  She prioritizes the results of Brandlistuen 2013[35] over Gustavson 2021.  Brandlistuen 2013 studied 2,919 same-sex sibling pairs from the MoBa cohort who were three years old and concluded that children exposed to long-term use of acetaminophen during pregnancy had substantial adverse developmental outcomes, for instance externalizing problems, at that age.  This comparison is inapt.  Most strikingly, Brandlistuen 2013 studied three-year olds for whom there was no ADHD diagnosis while Gustavson 2021 relied on an ADHD diagnosis in older children from the very same cohort.  Gustavson 2021 was specifically designed to better understand potential familial confounding of the association between prenatal acetaminophen exposure and ADHD.

---

[35] Brandlistuen et al., Prenatal Paracetamol Exposure and Child Neurodevelopment: A Sibling-Controlled Cohort Study, 42(6) Int'l J. Epidemiol. 1702 (2013).

In any event, Dr. Ness's report notes that if the results of Gustavson 2021 were replicated, "that would be a cause for greater concern about genetic confounding."  As already described, the results of Gustavson 2021 were recently replicated with a much larger sample:  Ahlqvist 2024 included over 31,000 sibling pairs discordant on both exposure and outcome.  Its authors reported that an initially-observed association between prenatal acetaminophen use and ADHD (1.07; 1.05-1.10) was attenuated to non-significance (0.98; 0.94-1.02) among siblings.  Id. at 1210.  Although at her deposition Dr. Ness took issue with the low prevalence of both an ADHD diagnosis and acetaminophen use in the study population in Ahlqvist 2024 (5.90% and 7.49%, respectively), the authors noted that "even if acetaminophen use had been substantially underascertained, such measurement error would have been unlikely to result in the null associations observed with sibling control.  Id.[36]

---

[36] Plaintiffs make much of the fact that in Ahlqvist 2024 only 7.49% of birthing parents reported acetaminophen use during pregnancy.  Id. at 1213.  They neglect, however, the authors' detailed analysis of that figure and its concordance with other studies measuring prenatal acetaminophen use in Sweden.  Id. at eAppendix 1.  Plaintiffs also neglect the authors' statement that "even large amounts of exposure measurement error could not explain the nullification of associations seen with sibling control."  Id. at 1213.

The implications from Ahlqvist 2024 for Dr. Ness's report are profound.  It is undisputed that ADHD is highly heritable; indeed, Dr. Ness states that "[c]learly, genetics contributes to ADHD risk."  Ahlqvist 2024, a sophisticated large-scale study funded by the NIH, finds that the apparent association between exposure to acetaminophen and ADHD disappears altogether when genetic confounding is accounted for through a sibling control study.  These are complex issues to investigate and for over a decade scientists across the globe have been designing and running studies to gain insight.  Ahlqvist 2024 must be taken seriously.

Plaintiffs argue -- without citation -- that the "Court is certainly not free to interpret a study result for itself, unconstrained by the actual record and adversarial process."  The parties have submitted the studies, including Ahlqvist 2024, in connection with this Daubert motion and have relied upon the Court to examine all of the submitted evidence in light of their arguments.  The parties have had an opportunity to be heard about Ahquvist 2024.  The Court will not ignore this study.

Moreover, it is the plaintiffs' burden to demonstrate that Dr. Ness's proffered testimony is reliable.  Her report and deposition testimony indicate that a study like Ahlqvist 2024 -- a larger scale study than that described in Gustavson 2021 --

# SPA-238

might change her opinion.  And, although she was presented with the study weeks before the parties' briefing deadlines, plaintiffs did not ask to supplement the record with expert testimony analyzing it.  The Court declines to blinker its assessment of the reliability of Dr. Ness's testimony simply because plaintiffs prefer that the Court not consider the study.  As Dr. Ness has acknowledged, the studies on which she relies reveal that any association between prenatal exposure to acetaminophen and ADHD in offspring is only "modest."  If that evidence of a modest association is eliminated entirely by a sibling control study, that result should not be ignored.  Where the expert is informed about a study, a court may consider an expert's failure to "explain . . . why [a] new study d[oes] not contradict his opinion," even if it "was not available to [the expert] when he prepared his report".  See Zoloft, 858 F.3d at 790, 790 n.10.  In any case, this Court would reach the same decision regarding Dr. Ness's reliability even if Ahlqvist 2024 had not been published.

Finally, plaintiffs insinuate some impropriety on behalf of defendants based on the fact that defendants "had prepared questions about the study in advance of the deposition" despite its publication that same day.  There is no basis to find any impropriety.  Many experts in the field would have had knowledge

64

well in advance of the publication date of both the existence of such an important study and then its submission for publication. It has 9 co-authors and was of course subject to peer review before publication.  If the plaintiffs had learned of the study and its results before publication, no one would be surprised.

In sum, although Dr. Ness spends more time on the issue of genetic confounding than the plaintiffs' prior experts, her opinion on this important issue is ultimately unreliable. Because of the importance of this issue to the assessment of causation of ADHD, her failure to reliably assess genetic confounding renders her ultimate opinion on causation inadmissible under Rule 702.

### 2.   Bradford Hill

Independent of Dr. Ness's failure to reliably assess the issue of confounding, her Bradford Hill analysis is deficient and inadmissible under Rule 702 standards.  To begin with, she identifies three Bradford Hill factors as the most important factors in her causation opinion: consistency, temporality, and dose-response.  Her discussion of each of these three factors, however, displays result-oriented reasoning, rendering her assessments unreliable.  Since the remaining factors cannot support a finding of causation, her Bradford Hill analysis must be stricken.

**SPA-240**

i. Consistency

The consistency factor arises from the insight that, to effectively demonstrate a causal relationship, it is important that an association be observed in different populations and by different investigators.  "Although inconsistent results do not necessarily rule out a causal nexus, any inconsistencies signal a need to explore whether different results can be reconciled with causality."  RMSE at 604.

Dr. Ness places "great" weight on the consistency criterion and finds that it is met here.  In support of her opinion that consistency is satisfied, she reports that the results of studies linking in utero exposure to acetaminophen and a diagnosis of ADHD "are almost uniformly positive and mostly statistically significant."  Dr. Ness points repeatedly to meta-analyses by Ricci 2023 and Masarwa 2020, stating that those two studies showed "remarkable consistency" and "no significant heterogeneity."  Dr. Ness acknowledges that the range of estimates within ADHD studies is broad but opines that when broken down by duration of use, the range is narrower.  She also opines that the "great majority" of studies found dose-response relationships and identified a specific window of sensitivity, specifically the second and/or third trimesters.  Finally, Dr. Ness also quotes FDA 2022 as stating that "neurobehavioral

66

outcome studies . . . suggest a consistent association between APAP or long durations of prenatal APAP exposure and ADHD."

As the defendants point out, each of these observations by Dr. Ness is faulty and is at odds with the data she cites.  To begin with, Dr. Ness mischaracterizes Ricci 2023 and Masarwa 2020.  The authors of Ricci 2023 actually state that "[e]ven in the ADHD meta-analyses, there was moderate heterogeneity."  Id. at 482.  Ricci 2023 added that the certainty of the evidence of even a small increased risk of ADHD "is low" in light of several factors, including the "limited number of sufficiently comparable studies available to meta-analyze."  Id. at 483.  The Masarwa 2020 authors state that "there was substantial heterogeneity in meta-analyses" and "insufficient data to explore the potential sources of this heterogeneity."  Id. at 315.  The authors of Ricci 2023 and Masarwa 2020 expressly caution that there was a need to conduct high-quality research and to explore the impact of confounding -- both by indication and parental ADHD -- on any perceived association.  Ricci 2023 at 482, 483; Masarwa 2020 at 313-14, 316.

Next, the heterogeneity does not disappear, as Dr. Ness suggests it does, by looking at duration of use, dose-response, and trimester of use.  As the defendants point out, although most of the studies found at least one statistically

significant, positive risk ratio, each study calculated risk
estimates for a variety of exposure measurements and their
results varied.  It is not a scientifically sound practice to
simply pick one or two risk estimates from each study without
acknowledging the rest of that study's findings.  Findings
regarding trimester of use illustrate the problem with Dr.
Ness's conclusion regarding consistency.  For instance, Liew
2014 found a significant association between an HKD diagnosis
and first trimester use, first and third trimester use, and use
in all three trimesters, but not in second or third trimester
use or use in both the second and third trimesters.  The same
study identified significant associations between ADHD
medication use and third trimester exposure, first and third
trimesters, second and third trimesters, and exposure in all
trimesters, but not in first, second, or first and second
trimesters.  In contrast, Ystrom 2017 identified significant
results only in the first and second trimester combined, but not
in any individual trimester (despite having larger sample sizes
than in Liew 2014) or in first and third, second and third, or
all three trimesters.  Next, Chen 2019 found no significant
associations in any trimester or combination of trimesters in
the general analysis, but did find a significant association in
the second trimester and first and second trimester (but not

# SPA-243

second and third or all three trimesters) in a sensitivity analysis excluding women with gestational infections and mental health disorders.  The only way to find, as Dr. Ness did, that the "great majority" of studies identified the second and/or third trimester as most sensitive to APAP exposure is to ignore statistical significance, cherry-pick data, and ignore contrary findings.  This is not a reliable application of scientific methodology.

Finally, Dr. Ness's quotation of FDA 2022 as stating that "in general, the functional neurobehavioral outcome studies examined in this review along with the reviewed meta-analyses suggest a consistent association between APAP or long durations of prenatal APAP exposure and ADHD" is misleading.  FDA 2022 at 32.  The following sentence, which she did not cite, reads, "However, findings for trimester-specific associations are not consistent."  Id.  Nor does she contend with the FDA's ultimate finding that "there are still study limitations and inconsistent study findings that prohibit causal interpretations of the association between APAP exposure and functional neurobehavioral outcomes."  Id. at 33.  Likewise, she does not mention FDA 2023's conclusion that "the limitations and inconsistent findings of current observational studies of APAP and

neurobehavioral and urogenital outcomes are unable to support a determination of causality." Id. at 17-18.[37]

The plaintiffs accuse the defendants of requiring an "impossible" standard for consistency that "requires all results and all sub-analyses to be statistically significant." Not so. Instead, what Rule 702 requires is an evenhanded application of methodologies. Here, instead of reliably describing and then grappling with the variability among -- and often within -- studies, Dr. Ness "cherry-pick[s] from the scientific landscape and present[s] the Court with what [s]he believes the final picture looks like." Daniels-Feasel, 2021 WL 4037820, at *4. She ignores the importance of statistical significance even in studies with large sample sizes like Ystrom 2017. Further, she misrepresents statements by the authors of the studies upon which she relies. Accordingly, her opinion on this factor does not pass muster under Rule 702.

---

[37] Indeed, Dr. Ness does not adequately address the FDA's repeated conclusion that the epidemiological evidence does not support her opinions. Despite including the "FDA productions in this litigation" in her list of materials considered, the entirety of her response to those materials is to complain that "the FDA nowhere explains why causation is still not the most likely explanation for the association, even if it is not the only possibility. Nor did FDA perform a Bradford Hill analysis, as I have here."

SPA-245

ii.    Temporality

A temporal or chronological relationship must exist for causation to exist.  RMSE at 601.  If an exposure occurs after the disease develops, it "cannot have caused the disease."  Id.

Dr. Ness puts "great weight" on the tenet of temporality and finds that it is met.  Dr. Ness opines that the prefrontal cortex is the brain region most important to ADHD, and the greatest risk from exposure to acetaminophen is in the third and possibly from the middle of the second trimester of gestation, which is also when the prefrontal cortex is most sensitive to disruption.  Dr. Ness points to Ystrom 2017, Chen 2019, Inoue 2021, and Stergiakouli 2016[38] to support her contention that acetaminophen use in the first trimester produced risk ratios of 1.09-1.31 and of 1.13-1.20 in the second semester.  In support of her opinion that risk ratios for acetaminophen use during the third trimester ranged from 1.28-2.86, and were 1.88-2.86 in four of five studies, she relies on Liew 2014, Ji 2018, Gustavson 2019,[39] Baker 2020, and Ji 2020.[40]

_____

[38] It is assumed that Dr. Ness is referring to Stergiakouli 2016 when she cites Stergiakouli 2018.

[39] Gustavson et al., Maternal Fever During Pregnancy and Offspring Attention Deficit Hyperactivity Disorder, 9 Scientific Reports 9519 (2019).

[40] As previously discussed, the two Ji studies do not reflect third trimester exposure; Ji 2020 reflects at most peripartum

71

**SPA-246**

The defendants challenge Dr. Ness's qualifications to opine on the trimester that is most sensitive for the development of the prefrontal cortex and take issue with the sources on which she relies to support her opinion.  But assuming that she could support that opinion, the defendants contend that the studies on exposure to acetaminophen by trimester found no statistically significant association between exposure in the third trimester and an ADHD diagnosis, with the majority of studies reporting lower effect estimates for the third trimester compared to the first or second trimester.

The defendants are correct to emphasize the importance of locating statistically significant results in those ADHD diagnosis studies that compare exposure by trimester.  As discussed below, only one sub-analysis in the studies cited by Dr. Ness showed a statistically significant positive risk ratio for acetaminophen exposure in the third trimester alone.  Dr. Ness insists that, because "[s]tatistical significance depends on sample size and any particular cut-off is arbitrary," it need not be "used as a measure of impact or import"; instead, "[e]ffects found in some studies can contribute to the case for

---

exposure.  Gustavson 2019, which primarily studied fever, found that children of mothers with fevers during pregnancy had similar odds of receiving an ADHD diagnosis whether or not the mother had taken acetaminophen for her fever.  Id. at 4.

causality even if they are not, alone, statistically
significant."  But Dr. Ness's reframing of the importance of
statistical significance goes beyond merely considering
insignificant results along with those that are significant, or
reading less into significance where sample sizes are small.
Instead, in her analysis of temporality, Dr. Ness often
disregards statistically significant results, or results from
studies with large sample sizes, and highlights insignificant
results in their stead.  This is not a reliable application of
scientific methodology.

Moreover, as the defendants rightly point out, Dr. Ness
engages in flagrant cherry-picking.  The defendants emphasize
three of the studies listed by Dr. Ness to make their point.
(The plaintiffs in their opposition brief do not suggest that
this choice omits a study of significance to Dr. Ness's
analysis.)

For instance, in Chen 2019's general analysis, the authors
found risk ratios of 1.09 (0.92-1.28) in the first trimester,
1.19 (1.00-1.40) in the second, and 0.97 (0.83-1.13) in the
third -- that is, no statistically significant result for any
trimester.  There were also no statistically significant results
among combined trimesters.  In the sensitivity analysis omitting
women with infections and mental health disorders, Chen 2019

**SPA-248**

found a risk ratio of 1.27 (1.00-1.61) in the first trimester, 1.33 (1.04-1.69) in the second trimester, and only 1.05 (0.85-1.29) in the third trimester.  For the first and second trimester combined, the Chen 2019 sensitivity analysis resulted in a risk ratio of 1.68 (1.18-2.40) for an ADHD diagnosis, and there were no statistically significant results for the first and third trimester, second and third trimester, or all three trimesters.  Thus, the only statistically significant results from the sensitivity analysis in Chen 2019 were for the second trimester and first and second trimester combined.  Of this data, Dr. Ness picked only the lower, non-significant first trimester risk ratio from the general analysis, ignoring the significant second trimester risk ratio in the sensitivity analysis and the fact that in both analyses the risk ratio was lower in the third trimester than the first, contrary to her opinion that the third trimester presents the greatest risk.

The next study is similarly problematic for Dr. Ness's conclusion.  Ystrom 2017 -- which had large samples for each trimester of exposure -- found risk ratios of 1.12 (0.94-1.32) for the first trimester, 1.04 (0.92-1.18) for the second, and 1.12 (0.75-1.67) for the third.  Thus, the risk ratios were the same for the first and third trimester, and none of the ratios were statistically significant.  But Ystrom 2017 found a

74

**SPA-249**

statistically significant risk ratio of 1.21 (1.06-1.39) for the first and second trimester combined -- again, contrary to Dr. Ness's opinion that the third trimester presents the greatest risk.

Finally, Liew 2014 found the following associations between exposure and an HKD diagnosis: 1.35 (1.07-1.72) for the first trimester, 1.26 (0.91-1.73) for the second, and 1.22 (0.97-1.53) for the third -- again showing a smaller (non-significant) risk for the third trimester than the (significant) first.  The same study, when assessing ADHD medication rather than an HKD diagnosis, found risk ratios of 1.09 (0.89-1.33) for the first trimester, 1.20 (0.91-1.55) for the second, and 1.28 (1.07-1.52) for the third.  Of all the Liew 2014 data, Dr. Ness picks only the third trimester risk ratios for ADHD medication use, ignoring the diagnostic data altogether, including the fact that again, the risk ratio for first trimester exposure and an HKD diagnosis was higher than for third trimester exposure.

Plaintiffs do not seriously engage with the above issues in their brief in opposition to this motion.  Instead, they devote most of their argument on temporality to the assertion that temporality should be considered satisfied because the exposures precede the development of ADHD symptoms.  But, as explained in the First Daubert Opinion, the relevant question is not whether

exposure precedes diagnosis but whether it precedes the development of the disorder.  2023 WL 8711617, at *31.

Because Dr. Ness's analysis of temporality repeatedly cherry picks isolated findings in studies, ignores those that are unsupportive of her ultimate opinion, and highlights statistically insignificant results while ignoring statistically significant results, her opinion on temporality is a "result-driven analysis" that "undermines principles of the scientific method."  Daniels-Feasel, 2021 WL 4037820, at *5.  It is not sufficiently reliable under Rule 702 standards to be admissible.

### iii.   Dose-Response

The factor of the dose-response relationship means that the greater the exposure, the greater the risk of disease.  If this relationship exists, it is strong but not essential evidence of causation because some causal agents require that the exposure exceed a certain dose to have a causal effect.  RMSE at 603.

Dr. Ness weighed dose-response "heavily" in her determination of causality and found that it is met.  Dr. Ness states that longer durations of use, greater frequency of use, and higher concentration (in meconium, cord blood and maternal blood) demonstrate a dose-response relationship between exposure

to acetaminophen and an ADHD diagnosis.[41]  Dr. Ness considers Baker 2020 to be "most informative regarding this criterion."  Dr. Ness also claims that the authors of Liew 2014 "found exposure response trends with increasing frequency of use during gestation."

Defendants argue that Dr. Ness does not effectively engage with the difficulty of measuring dosage, is over-reliant on Baker 2020, misreads Liew 2014, and fails to acknowledge those studies that did not show dose-response.  Their arguments are well taken.

It is challenging, as everyone recognizes, to formulate a reliable dose-response study for acetaminophen exposure during a pregnancy.  Because with rare exceptions acetaminophen is not a prescription medication, it is difficult to measure the actual amount consumed by pregnant women.  First Daubert Opinion, 2023 WL 8711617, at *7-8.  Dr. Ness justifies her reliance on crude exposure measurements by a comparison to the government studies of contaminated drinking water at Camp Lejeune.  But anyone who lived or worked at Camp Lejeune would most likely have been exposed daily to the drinking water, so duration of exposure was

---

[41] Dr. Ness does not opine that exposure to acetaminophen for at least 28 days in utero increases the risk of developing ADHD twofold.  This is the opinion proffered by Dr. Louie, on whom the plaintiffs first relied.  See First Daubert Opinion, 2023 WL 8711617, at *47.

**SPA-252**

a reasonable proxy for dosage there.  In contrast, in the acetaminophen studies, one week of exposure (as reported or remembered by mothers), could be one tablet (of unknown dose) or over seven.  Similarly, one trimester could be exposure to one tablet or over 90 or indeed many more.  Even if it were possible to overlook this vulnerability in Dr. Ness's analysis, her treatment of the studies on which she relies and her failure to discuss other clearly relevant studies are a different matter.

Dr. Ness relies most heavily on Baker 2020.  To recap, Baker 2020 measured acetaminophen levels in meconium samples and found that a low acetaminophen level did not significantly modify the risk of ADHD compared with no acetaminophen (1.44; 0.79-2.63), but high levels increased the odds of ADHD more than four-fold (4.10; 2.41-6.95).  The authors of Baker 2020 cautioned, however, that they did not correlate maternal acetaminophen use with the acetaminophen concentrations in meconium.  Id. at 1078-79.

Moreover, Baker 2020 did not adjust for confounding.  First Daubert Opinion, 2023 WL 8711617, at *30.  And, studies like Ystrom 2017 have shown that longer-term use may indicate longer-term indication for use, particularly to treat pain.[42]  Out of

---

[42] Headache is the most common indication for use during pregnancy and is rarely accounted for in the studies on which Dr. Ness relies.  Vlenterie 2016 found that, of women in the

# SPA-253

1034 mothers in that study reporting 29 or more days of use, 609 indicated use for pain, while 200 did not specify an indication. Id. at 6.  Thus, an over-reliance on Baker 2020 compared to studies that were able to adjust for confounding, including by indication, presents a serious problem for Dr. Ness's dose-response analysis.

Significantly, Gustavson 2021, which used more recent data from the same cohort used by Ystrom 2017, found, like Ystrom 2017, a doubling of the risk (2.02; 1.17-3.25) for 29 or more days of use.  But equally if not more important, Gustavson 2021 addressed the issue of genetic confounding.  The increased risk of an ADHD diagnosis associated with long term exposure to acetaminophen was attenuated to 1.06 (0.51-2.05) and not statistically significant when adjusted for family effect.  Id.

---

MoBa cohort who used APAP for 28 or more days during pregnancy, the most common indications for use were headache or migraine (80.2%), back pain (66%), and pelvic girdle pain (49.9%). Vlenterie et al., Neurodevelopmental Problems at 18 Months Among Children Exposed to Paracetamol in utero: A Propensity Score Matched Cohort Study, 45 Int. J. Epidemiol. 1998, 2002 (2016). Gustavson 2021 found that pain conditions constituted 82% of the conditions for which acetaminophen was used for 29 days or more. Id. at 5.  In support of her assertion that pain is not a confounder, Dr. Ness lists studies which, with one exception, did not include ADHD as an endpoint.  The study that did use ADHD as an endpoint found that adjusting for maternal migraine decreased the association between prenatal acetaminophen exposure and an ADHD diagnosis.  Masarwa 2020 at 314.

at 7.  Dr. Ness does not discuss this in her analysis of dose-response.

The defendants argue as well that it is significant that Dr. Ness dismissed Chen 2019 as an "outlier."  Chen 2019 found a lower, non-significant risk ratio for acetaminophen use in all three trimesters (1.12; 0.97-1.29) compared to use in any trimester (1.40; 1.14-1.73).  Id. at e5.  She states that "this is to be expected given small sample sizes and wide confidence intervals."  But Chen 2019 had larger sample sizes and narrower confidence intervals than Baker 2020.

Overall, Dr. Ness's assessment of dose-response is undercut by the limited data on which it is based and her failure to consider the impact of confounding by indication and genetics on the studies on which she relies most heavily for this factor.  As a result, her assessment of this factor is not sufficiently reliable to support her heavy reliance on it in her overall causation analysis.

> iv.  Strength, Biological Plausibility, Analogy, Coherence, Specificity, Experiment

Dr. Ness's assessment of the remainder of the Bradford Hill factors does not support a finding of causality.  She admits that neither specificity nor experiment are met.  Dr. Ness opines that the strength of association is "modest" and finds that factor only "partially met."  Dr. Ness puts "little weight"

on the criterion of analogy, which examines whether exposures
with similar mechanisms have been shown to cause the outcome of
interest.  That leaves two other factors.

Dr. Ness agrees with the observation that biologic
plausibility "is neither necessary nor sufficient for causation
-- it merely bolsters the case for causation that is evident
from the human epidemiology."  Nonetheless, she gives this
factor moderate weight and finds it is met.  Her opinion on a
potential biological mechanism, which is largely derived from
her reading of animal studies, is flawed for the same reasons as
those of plaintiffs' prior experts:  it fails to reliably fill
critical gaps in the purported mechanistic pathway.  <u>See</u> First
Daubert Opinion, 2023 WL 8711617, at *38-41.

Finally, Dr. Ness describes the coherence criterion as
addressing the overarching question of whether the hypothesized
causal relation conflicts with current biological and
epidemiological understandings of the disease process.  Dr. Ness
places low weight on coherence, but believes it is satisfied.
She draws her opinion on coherence entirely from her opinions on
strength, consistency, dose-response, temporality, analogy, and
biological plausibility.  Because Dr. Ness's treatment of
coherence explicitly relies on opinions that this Opinion finds

**SPA-256**

unreliable, it cannot fill the gap and support a finding of causation.

In sum, Dr. Ness's analyses of the factors upon which she placed the most weight -- consistency, temporality, and dose-response -- are unreliable. Accordingly, her Bradford Hill assessment of causation fails the requirements of Rule 702. Even if it were possible to rely solely on the additional Bradford Hill factors (and it is not), they also fail to support a finding of causation.

To be sure, given the state of the science Dr. Ness confronted long odds in offering her opinion on causation. ADHD can be a serious disorder, and scientists have sought to understand its origins. It is now estimated to be approximately 74% heritable. Many potential linkages to ADHD have been studied, among them the potential association between ADHD and prenatal exposure to acetaminophen. Dr. Ness acknowledges that the evidence of any association between prenatal exposure to acetaminophen and an ADHD diagnosis in offspring is only "modest." Sibling control studies, which Dr. Ness rates as among the most reliable of studies, have found that any apparent association between acetaminophen exposure and ADHD disappears altogether when genetic confounding is accounted for. Medical associations and government bodies have weighed in on this issue

and none has opined that there is a causal link through prenatal exposure to acetaminophen.  Even the authors of the Consensus Statement clarified that they had avoided any inference of causality.  Against this backdrop, Dr. Ness offers her opinion that "within a reasonable degree of scientific certainty, prenatal use of APAP causes ADHD."

Admittedly, in giving this opinion, Dr. Ness avoids some of the difficulties posed by the analyses of the plaintiffs' first set of experts.  She does not attempt to provide a transdiagnostic analysis of the literature and does not opine that exposure to acetaminophen causes ASD.  She instead limits her Bradford Hill analysis to ADHD and largely focuses on studies with an ADHD diagnosis as the measured endpoint.  She also more seriously considers the issue of confounding. Nevertheless, the weaknesses in her report, confirmed by her deposition testimony, render her opinion on causation unreliable and inadmissible.  Simply stated, her Bradford Hill analysis is not an objective or rigorous application of scientific methodology.  It was result driven.  Independently, her failure to confront carefully and fairly the profoundly important issue of confounding by genetics renders her opinion on causation inadmissible.

The plaintiffs argue that a jury and not a court must determine whether Dr. Ness's opinion on causation is correct because this is an issue on which reasonable scientists can disagree.  Had Dr. Ness's opinion passed muster under Rule 702, it would be the jury's duty to assess it.  But as the Supreme Court determined in Daubert, Rule 702 requires that "an expert's testimony pertain to 'scientific knowledge,'" thereby establishing a standard of evidentiary reliability.  509 U.S. at 590.  Under the Rules of Evidence, it is the task of the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Id. at 589.  The plaintiffs have failed to make the requisite showing of reliability required by Rule 702.

### Conclusion

The defendants' motion of March 29, 2024 to exclude Dr. Ness's general causation opinion is granted.


Dated:     New York, New York
           July 10, 2024


                                        DENISE COTE
                              United States District Judge

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
IN RE: Acetaminophen – ASD-ADHD         :
Products Liability Litigation           :
                                        :
This Document Relates To: All Pending   :
Cases                                   :
--------------------------------------- X
```

     :    22MD3043 (DLC)
     :    22MC3043 (DLC)
     :
     :    OPINION AND
     :    ORDER

APPEARANCES:

For plaintiffs:
Keller Postman LLC
Ashley C. Keller
Ashley Barriere
150 N. Riverside Plaza, Ste. 4100
Chicago, IL 60606

Bernstein Liebhard LLP
Daniel C. Burke
10 East 40th St
New York, NY 10016

Wagstaff & Cartmell, LLP
Lindsey Scarcello
4740 Grand Avenue, Ste 300
Kansas City, MO 64112

For defendants:
Barnes & Thornburg LLP
Kristin L. Richer
Jessica L. Brennan
2029 Century Park East, Suite 300
Los Angeles, CA 90067

King & Spalding LLP
Kristen R. Fournier
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

Skadden, Arps, Slate, Meagher & Flom LLP
Jessica Davidson
One Manhattan West
New York, NY 10001

# SPA-260

DENISE COTE, District Judge:

This Opinion grants summary judgment to the defendants in pending cases in this products liability MDL. Prior Opinions have excluded testimony from the plaintiffs' experts on the issue of general causation. The plaintiffs have resisted summary judgment by arguing that they can meet their burden of establishing general causation by using certain statements made by one of the defendants' experts. For the following reasons, that effort fails and the defendants are entitled to summary judgment.

## Background

Familiarity with prior Opinions in this MDL is assumed. This Opinion summarizes only those facts relevant to this motion.

This litigation began in 2022, when plaintiffs -- children, parents, and guardians who alleged injuries from the development in children of autism spectrum disorder ("ASD") and attention deficit hyperactivity disorder ("ADHD") due to a mother's prenatal use of acetaminophen -- began to file products liability lawsuits in federal courts. Plaintiffs sued the manufacturer of Tylenol (Johnson & Johnson Consumer Inc.) and retailers of store-branded acetaminophen products, alleging that

the defendants' labeling practices for acetaminophen were
deficient under various state laws.

In October of 2022, the Judicial Panel on Multidistrict
Litigation consolidated plaintiffs' cases and transferred the
cases to this Court under 28 U.S.C. § 1407.  This MDL has
included hundreds of cases.  Motions to dismiss individual
actions on the ground of preemption were denied in November 2022
and April 2023.[1]  Additional motions to dismiss were addressed in
April and May of 2023.[2]

All fifty states require some evidence of general causation
in products liability cases involving medical issues.  See In re
Mirena IUS Levonorgestrel-Related Products Liability Litigation,
982 F.3d 113, 124 (2d. Cir. 2020) ("Mirena II").  At a pretrial
conference on December 2, 2022, the Court proposed, and the
parties agreed, to conduct discovery related to general
causation first; if the plaintiffs' experts on the issue of
general causation survived Rule 702 motions, the remainder of

---

[1] In re Acetaminophen – ASD-ADHD Prods. Liab. Litig., No 22md3043
(DLC), 2022 WL 17348351 (S.D.N.Y. Nov. 14, 2022); 2023 WL
3026412 (S.D.N.Y. Apr. 20, 2023).

[2] In re Acetaminophen – ASD-ADHD Prods. Liab. Litig., No.
22md3043 (DLC), 2023 WL 3045802 (S.D.N.Y. Apr. 21, 2023); 2023
WL 3126589 (S.D.N.Y. Apr. 27, 2023); 2023 WL 3126636 (S.D.N.Y.
Apr. 27, 2023); 2023 WL 3162623 (S.D.N.Y. Apr. 28, 2023); and
2023 WL 3467057 (S.D.N.Y. May 15, 2023).

discovery would proceed.  The initial Rule 702 motions were fully submitted on October 20, 2023.  The plaintiffs had identified five experts to the defendants and the defendants had moved to strike pursuant to Rule 702 the opinions of each of those experts.  Oral argument on the defendants' motions to strike the plaintiffs' expert reports was held on December 7, 2023.

On December 18, 2023, the First Daubert Opinion was issued.[3] The 148-page Opinion excluded the proposed testimony of the five experts for the plaintiffs: Drs. Andrea Baccarelli, Robert Cabrera, Eric Hollander, Brandon Pearson, and Stan Louie, each of whom was tendered in support of a transdiagnostic opinion that prenatal exposure to acetaminophen causes both ASD and ADHD.[4]  The plaintiffs' Rule 702 motions to exclude defendants' experts were denied as moot.  Pursuant to an Order to Show Cause process, final judgment was entered in approximately 550 cases

---

[3] In re Acetaminophen – ASD-ADHD Prods. Liabl. Litig., --- F.Supp.3d ---, No. 22md3043 (DLC), 2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023).

[4] Dr. Hollander defined a transdiagnostic process as a "mechanism that underlies and connects a group of disorders that transcends traditional diagnostic boundaries" and opined that "it is appropriate to review the body of evidence that measures symptoms of neurodevelopmental disorders and to not limit the analysis to studies that focus on ASD and ADHD as specified outcomes when evaluating the potential causal association between prenatal [acetaminophen] exposure and ASD and ADHD in offspring."

# SPA-263

in the MDL, specifically those cases in which a Short Form Complaint was served on or before January 11, 2024.  Those plaintiffs have appealed.

On February 1, the plaintiffs in several newly-filed actions advised the Court that they had retained their own expert, Dr. Roberta Ness, who offered opinion testimony on general causation as to ADHD only.  Over the objection of the defendants, the Court permitted these plaintiffs to substitute Dr. Ness as their general causation expert and set a schedule for further Rule 702 briefing.  Defendants' Rule 702 motion to exclude opinions offered by Dr. Ness was fully submitted on June 11, 2024.  An 84-page Opinion and Order of July 10 granted defendants' motion.  In re Acetaminophen – ASD-ADHD Prods. Liabl. Litig., No. 22md3043 (DLC), 2024 WL 3357608 (S.D.N.Y. Jul. 10, 2024) ("Second Daubert Opinion").

An Order of July 11 required plaintiffs to show cause by July 25 why final judgment under Rule 56 should not be entered in each pending member case of this MDL on the ground that the plaintiffs in these member cases have failed to offer admissible evidence that prenatal exposure to acetaminophen causes ADHD in offspring.  On July 25, plaintiffs submitted their response, in which they argue that summary judgment is improper because prior statements by one of the defendants' experts, Dr. Stephen

**SPA-264**

Faraone, provide sufficient admissible evidence to show general causation as to ADHD.  An Order of July 26 set a schedule for briefing on this issue, which was fully submitted on August 16.

## Discussion

Plaintiffs in this MDL have presented six experts to opine that prenatal exposure to acetaminophen can cause ADHD and/or ASD.  The Court carefully considered each expert's proffered testimony and determined, in two separate opinions, that none of these experts presented reliable testimony on general causation. Plaintiffs now argue that they can satisfy their burden on general causation by presenting a handful of prior statements by one of defendants' experts, who has repeatedly opined that existing studies and data do not supply a reliable basis on which to find that acetaminophen can cause ADHD.  Defendants argue that plaintiffs' new approach falls short of creating a genuine issue of material fact.

Summary judgment may be granted "only if there is no genuine issue of material fact and the prevailing party [is] entitled to judgment as a matter of law."  Indemn. Ins. Co. of N. Am. v. Unitrans Int' l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted).  "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. (citation omitted).  The court's

6

**SPA-265**

role is "not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).

In determining whether genuine issues of fact exist, the court "may not properly consider the record in piecemeal fashion." Id. (citation omitted). Instead, "the court must review the record taken as a whole." Id. (citation omitted). The court "may not make credibility determinations or weigh the evidence," but "reliance upon conclusory statements or mere allegations will not suffice to defeat summary judgment." Id. at 227-28 (citation and emphasis omitted). When a party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is proper. Id. at 228 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). But if "the admissible materials in the record make it arguable that the claim has merit, then summary judgment dismissing a claim cannot be granted." Id. (citation and emphasis omitted).

In "cases where jurors are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training," expert testimony is unnecessary. Ojeda v. Metropolitan Transportation

Authority, 41 F.4th 56, 70 (2d Cir. 2022) (citation omitted).
Where, however, a necessary element of a claim "would not be
obvious to the lay juror," expert testimony is required.  Id.
(citation omitted).

     "[E]xpert medical opinion evidence is usually required to
show the cause of an injury or disease because the medical
effect on the human system of the infliction of injuries is
generally not within the sphere of the common knowledge of the
lay person." Barnes v Anderson, 202 F.3d 150, 159 (2d Cir.
1999).  Accordingly, the Court of Appeals for the Second Circuit
has required expert testimony "to establish the causal link
between exposure to toxins and other behavior and squamous cell
carcinoma." Ojeda, 41 F.4th at 70 (citation omitted).  See also
In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices
and Products Liability Litigation, 892 F.3d 624, 647 (4th Cir.
2018) ("Lipitor") (noting with approval the Second Circuit's
observation that all fifty states typically require expert
testimony to prove causation where the causal relationship is
outside the common knowledge of lay jurors).

     Causation in pharmaceutical products liability cases such
as those in this MDL has two components, general and specific
causation.  General causation exists when a substance is capable
of causing a particular injury or condition.  Courts routinely

**SPA-267**

grant summary judgment for the defense in pharmaceutical product
liability or toxic tort cases where plaintiffs fail to adduce
reliable expert testimony establishing general causation.  See,
e.g., Mirena II, 982 F.3d at 125; Milward v. Rust-Oleum Corp.,
820 F.3d 469, 476 (1st Cir. 2016) (noting expert testimony is
required to establish medical causation under Massachusetts
law); Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256,
271 (2d Cir. 2002).

One generally accepted methodology for determining general
causation among epidemiologists is consideration of the Bradford
Hill criteria.  These criteria are the metrics that
epidemiologists use to distinguish a causal connection from mere
association.  First Daubert Opinion, 2023 WL 8711617, at *18.  A
court must ensure that an expert conducts a Bradford Hill
analysis in a reliable manner.  In re Zoloft (Sertraline
Hydrochloride) Products Liability Litigation, 858 F.3d 787, 795
(3d Cir. 2017) ("Zoloft").  Therefore, the expert must explain
how conclusions are drawn for each Bradford Hill criterion and
how the criteria are weighed relative to one another.  Id. at
796.

The defendants have shown that they are entitled to summary
judgment.  The plaintiffs have failed to offer reliable expert
testimony as to general causation.  The Daubert Opinions in this

9

litigation have stricken the testimony proffered by the plaintiffs' experts on the issue of general causation.  Without expert evidence, plaintiffs cannot meet their burden on an essential element of their case.  Without such expert testimony, a lay juror could only find that prenatal exposure to acetaminophen causes ADHD in offspring by resorting to speculation.

Plaintiffs argue that summary judgment is improper because Dr. Faraone's prior statements will supply sufficient admissible evidence from which a jury could infer general causation, thereby creating a genuine issue of material fact.  Plaintiffs suggest that a jury could find general causation based on 1) two brief excerpts from Dr. Faraone's day-long deposition testimony in this litigation; 2) Dr. Faraone's statements in peer-reviewed scientific literature or other formal documents; and 3) Dr. Faraone's prior unsworn statements, principally LinkedIn posts, which the plaintiffs contend can be admitted for purposes of impeachment (together, the "Faraone Evidence").

Dr. Faraone is a world-renowned expert on ADHD.  He is a Distinguished Professor in the Departments of Psychiatry and Neuroscience & Physiology at the State University of New York Upstate Medical University and Vice Chair for Research in the Department of Psychiatry and Behavioral Sciences at that

10

University.  He has performed original research on the
diagnosis, etiology, and pathophysiology of ADHD and has
published more than 840 articles on ADHD.  In 2019, he was
elected, and in 2023 re-elected, President of the World
Federation of ADHD.  In 2021, he coordinated the creation and
publication of the World Federation of ADHD International
Consensus Statement on ADHD,[5] one of the documents upon which
plaintiffs rely.  In Dr. Faraone's amended expert report of
August 22, 2023, submitted on behalf of the defendants, he
opined that there is no reliable scientific evidence that
maternal use of acetaminophen causes ADHD in offspring.  He
noted that although more than 20 epidemiological studies had
been published by that date, those studies did not support a
causal inference.

The Faraone Evidence, even if admissible, would not permit
a jury to find for plaintiffs on the element of general
causation.[6]  Even if cobbled together, the Faraone Evidence does
not constitute a Bradford Hill analysis in support of

---

[5] Faraone et al., The World Federation of ADHD International
Consensus Statement: 208 Evidence-based Conclusions about the
Disorder, 128 Neuro. Biobehavioral Rev. 789 (2021) ("ADHD
Consensus Statement").

[6] It is unnecessary to address the admissibility of the Faraone
Evidence because, even if each statement were admissible, the
statements would not constitute reliable evidence of general
causation in support of the plaintiffs' theory.

plaintiffs' thesis.  When Dr. Faraone examined the published
scientific data using the Bradford Hill criteria, he found that

> the criteria do not support a causal inference.
> Strength of association is not satisfied because the
> reported associations are weak and influenced by
> confounding.  The study results are inconsistent
> across different populations and measures.  Many of
> the reported associations are not specific to ADHD.
> There is no clear dose response reported in the
> literature.  And the association is not biologically
> plausible because there is no known pathophysiological
> mechanism of injury for the development of ADHD.

In none of the statements on which plaintiffs rely does Dr.
Faraone state that prenatal exposure to acetaminophen causes
ADHD in offspring.  Instead, plaintiffs seize on fragments from
Dr. Faraone's extensive writings and prior statements and
misleadingly portray those fragments.  When read in context, Dr.
Faraone's statements and testimony do not support plaintiffs'
theory of general causation.  To the contrary, as his expert
report and deposition testimony describe in considerable detail,
his analysis is in line with the statements of public health
organizations and regulatory agencies that there is no reliable
evidence of a causal relationship between in utero exposure to
acetaminophen and the development of ADHD.  See First Daubert
Opinion, 2023 WL 8711617, at *12-15; Second Daubert Opinion,
2024 WL 3357608, at *10-13.

Much of the Faraone Evidence falls into one of three
buckets.  First, there are several statements that do not even

refer to acetaminophen.  They instead speak more generally to
the fact that environmental risk factors may contribute to the
development of ADHD even though ADHD is a highly heritable
disorder.

     Second, the majority of the statements merely acknowledge
that studies have documented an <u>association</u> between prenatal
acetaminophen exposure and ADHD.  That this is so has never been
a disputed proposition in this case.  Plaintiffs' experts have
conceded, however, that the association is weak or modest at
best.  And, as explained at length in both Daubert Opinions in
this case, an association, by itself, does not establish
causation; instead, further analysis must be conducted to assess
whether the association is causal or is instead a result of
chance, confounding, or bias.  <u>See, e.g.</u>, First Daubert Opinion,
2023 WL 8711617, at *5; Second Daubert Opinion, 2024 WL 3357608,
at *5.  Indeed, both Daubert Opinions thoroughly addressed the
importance of confounding to this case.  <u>See, e.g.</u>, First
Daubert Opinion, 2023 WL 8711617, at *31-*33; Second Daubert
Opinion, 2024 WL 3357608, at *19-*21.  A jury would not be
permitted to return a verdict based on a possibility of
causation.  As the Fourth Circuit Court of Appeals has observed,
where "most of the statements" proffered by plaintiffs to defeat
summary judgment "speak to association rather than causation,"

asking a jury "to reach a conclusion as to causation with any amount of certainty would be farcical and would likely result in a verdict steeped in speculation". Lipitor, 892 F.3d at 647.

As for the third collection of statements, plaintiffs point to statements by Dr. Faraone (or his co-authors) which refer to acetaminophen as a "risk factor" for ADHD. But Dr. Faraone repeatedly explained in his deposition that the term "risk factor" is a synonym for "correlate" and that "it's not the same as cause." Indeed, he specified that the term "risk factor" "is sometimes misinterpreted by lay people" to mean cause, highlighting the impropriety of inviting a jury to speculate as to whether a patchwork of Dr. Faraone's out-of-context statements, rather than his expert opinion to the contrary, proves general causation.

The plaintiffs place the most weight on two brief excerpts from Dr. Faraone's deposition in this litigation, which they construe as admissions that acetaminophen exposure causes ADHD. In one excerpt, Dr. Faraone is shown a slide he created on the causes of ADHD, which lists modifiable environment risk factors as including exposure to acetaminophen. As already explained, and as Dr. Faraone explained in his deposition, identifying a behavior or a substance as a risk factor is not a finding of causation; it is identifying a correlation.

**SPA-273**

In the second excerpt from his deposition, Dr. Faroane is questioned about "Statement 38" in the ADHD Consensus Statement. Statement 38 describes a Taiwanese study that found an association between in utero exposure to acetaminophen and a 33% greater likelihood of developing ADHD during childhood.[7] Statement 38 is one of twelve statements or paragraphs describing individual studies of "Environmental correlates of ADHD: exposure to toxicants." Even though Statement 38 did not speak in terms of causation, plaintiffs' counsel inquired as follows: "Statement 38 represents one of the evidence-based conclusions that the scientific community has concluded regarding the <u>causes</u> of ADHD, right?" Dr. Faraone answered "Yes, that's correct". After further discussion, plaintiffs' counsel inquired again about Statement 38, asking, "was one of the evidence-based findings that . . . acetaminophen during pregnancy <u>is associated with</u> a 33 percent greater likelihood of ADHD in children?" Dr. Faraone responded, "That's a Taiwanese study, correct." In his second question, plaintiffs' counsel correctly characterized Statement 38. Dr. Faraone's failure to catch and correct the mischaracterization in the first question

---

[7] The study in question -- the results of which were addressed in both Daubert Opinions in this case -- is Chen et al., <u>Prenatal Exposure to Acetaminophen and the Risk of Attention-Deficit/Hyperactivity Disorder: A Nationwide Study in Taiwan</u>, 80(5) J. Clin. Psychiatry (2019).

about Statement 38 does not provide a reliable basis to find
that Dr. Faraone's true opinion is that acetaminophen exposure
causes ADHD.

Even though none of these statements, either singly or
together, constitutes a methodical analysis of the issue of
causation, plaintiffs suggest that, "[g]iven the sheer number of
Dr. Faraone's inconsistent statements coupled with his published
pre-litigation statements, a reasonable jury could conclude that
prenatal exposure to acetaminophen can in fact cause ADHD."
They argue that

> [t]he Faraone evidence, construed in the light most
> favorable to Plaintiffs, can reasonably support the
> following factual findings: (1) there is a positive
> and statistically significant association between
> prenatal acetaminophen exposure and ADHD; (2) there is
> a dose-response relationship between acetaminophen
> exposure and ADHD; (3) it "makes biological sense"
> that prenatal acetaminophen exposure can cause ADHD;
> (4) environmental risk factors play a role in causing
> ADHD; and (5) acetaminophen is one of the
> environmental risk factors that plays a role in
> causing ADHD.

Plaintiffs propose that a jury stitch the above
propositions together to find general causation despite the fact
that Dr. Faraone has repeatedly stated -- both in his 98-page
amended expert report for the defendants, which plaintiffs
ignore, and in his deposition in this litigation -- that there
is no reliable scientific evidence that maternal use of
acetaminophen causes ADHD in offspring.  Even setting aside the

# SPA-275

fact that the plaintiffs have mischaracterized Dr. Faraone's prior statements, their proposal also fundamentally misunderstands the process by which scientists assess the issue of general causation. "Drawing causal inferences after finding an association and considering [the Bradford Hill] factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship." Reference Manual on Scientific Evidence (3d ed. 2011) ("RMSE") at 600. Plaintiffs' proposal -- that a series of disparate scientific observations is adequate for a jury to find general causation -- is not viable. The issue of general causation in this litigation is complex and serious. Juries are entitled to a thoughtful, reliable analysis by a qualified expert.

No reasonable jury could find, from the smattering of Dr. Faraone's past statements and isolated pieces of his deposition identified by plaintiffs, that prenatal exposure to acetaminophen can cause ADHD in offspring. As such, plaintiffs have failed to make a sufficient showing on an essential element of their case with respect to which they have the burden of proof. Summary judgment is therefore granted for defendants.[8]

_____

[8] The defendants argue that plaintiffs' response to the July 11 show cause Order has vexatiously multiplied proceedings, entitling defendants to fees and costs incurred in preparing

# SPA-276

### Conclusion

Final judgment is entered for defendants in all pending member cases.  The Clerk of Court is directed to enter judgment for defendants and to close all pending member cases.


Dated:     New York, New York
           August 20, 2024


                                    _____
                                         DENISE COTE
                                    United States District Judge


---

their response pursuant to 28 U.S.C. § 1927.  It bears noting that the plaintiffs' reliance on cherry-picked statements by a defense expert to fill the gap in their own evidence of general causation appears to be an established litigation tactic to resist summary judgment.  See, e.g., In re Mirena IUS Levonorgestrel-Related Products Liability Litigation, 387 F. Supp. 3d 323, 350-52.  This tactic has been consistently rejected by courts.  Nonetheless, any award of sanctions must be supported by an explicit finding of bad faith.  See Rossbach v. Montefiore Medical Center, 81 F.4th 124, 143 (2d Cir. 2023).  In the absence of a formal motion, the defendants' argument will not be further considered.

18

# SPA-277

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

IN RE: Acetaminophen – ASD-ADHD
Products Liability Litigation

This Document Relates To: **All Pending Cases**

-------------------------------------------------------------X

22 **MD** 3043 (DLC)
22 **MC** 3043 (DLC)

## <u>JUDGMENT</u>

     It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated August 20, 2024, Final judgment is entered for defendants in all pending member cases. The Clerk of Court is directed to enter judgment for defendants and to close all pending member cases. Accordingly, all pending cases are closed.

**Dated:** New York, New York

     August 21, 2024

**DANIEL ORTIZ**
**Acting Clerk of Court**

**BY:**  _____
**Deputy Clerk**

# SPA-278



**United States District Court**
**Southern District of New York**

Daniel Ortiz
*Acting Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $605 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.*  Please see District Court fee schedule at https://www.nysd.uscourts.gov/programs/fees. If you are unable to pay the $605 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

**SPA-279**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (        )(       )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the        ☐ judgment    ☐ order    entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____

Dated                                          Signature *

_____

Name (Last, First, MI)

_____

Address                          City              State              Zip Code

_____          _____

Telephone Number                    E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

**SPA-280**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____                  _____CV_____ (        )(        )

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                                       **MOTION FOR EXTENSION
                                                         OF TIME TO FILE NOTICE
                                                         OF APPEAL**

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required

                                   date

time period because:

_____

_____

_____

(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

Dated: _____              Signature _____

_____

Name (Last, First, MI)

_____

Address                        City              State              Zip Code

_____              _____

Telephone Number                              E-mail Address (if available)

Rev. 3/27/15

# SPA-281

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (        )(        )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                    **MOTION FOR LEAVE TO
                                             PROCEED IN FORMA
                                             PAUPERIS ON APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.


_____          _____
Dated                                 Signature

_____
Name (Last, First, MI)

_____
Address                    City              State              Zip Code

_____          _____
Telephone Number                      E-mail Address (if available)

Rev. 12/23/13

# SPA-282

## Application to Appeal In Forma Pauperis

_____**v.** _____    Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.      *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

# SPA-283

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | **$** | **$** | **$** | **$** |

2.      *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.      *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

# SPA-284

4.      *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.      *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
|  |  | Make and year: |
|  |  | Model: |
|  |  | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: |  |  |
| Model: |  |  |
| Registration #: |  |  |

- 3 -

# SPA-285

6.　　*State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.　　*State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.　　*Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>　　Are real estate taxes included?　　[　] Yes  [　] No<br>　　Is property insurance included?　　[　] Yes  [　] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

# SPA-286

| | | | |
|---|---|---|---|
| Transportation (not including motor vehicle payments) | | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | | |
| | Homeowner's or renter's: | $ | $ |
| | Life: | $ | $ |
| | Health: | $ | $ |
| | Motor vehicle: | $ | $ |
| | Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | | $ | $ |
| Installment payments | | | |
| | Motor Vehicle: | $ | $ |
| | Credit card (name): | $ | $ |
| | Department store (name): | $ | $ |
| | Other: | $ | $ |
| Alimony, maintenance, and support paid to others | | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | | $ | $ |
| Other (specify): | | $ | $ |
| **Total monthly expenses:** | | **$** | **$** |

9.   *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

     [  ] Yes        [  ] No        If yes, describe on an attached sheet.

10.  *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* [  ] Yes [  ] No

     *If yes, how much?* $ _____

- 5 -

**SPA-287**

11.    *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.    *Identify the city and state of your legal residence.*

City _____    State _____

Your daytime phone number: _____

Your age: _____    Your years of schooling: _____

Last four digits of your social-security number: _____